PETITION OF THE DEPARTMENT OF PUBLIC WELFARE TO DISPENSE WITH CONSENT TO ADOPTION.

Middlesex. April 4, 1978. — August 29, 1978.

Present: HENNESSEY, C.J., BRAUCHER, KAPLAN, WILKINS, & LIACOS, JJ.

*Adoption*, Dispensing with parent's consent. *Due Process of Law*, Adoption.

Upon petitions by the Department of Public Welfare under G. L. c. 210, § 3 (*b*), as appearing in St. 1972, c. 800, § 2, to dispense with the consent of the respondent parents to adoption of their two minor children, where it appeared that the respondents were unable "to assume parental responsibility" for the children, and the department submitted a plan calling for separate placement of the children in different types of environments, the older child in a therapeutic environment and the younger child in a permanent family milieu, and the children's guardian ad litem and the respondents recommended placement of the children with their maternal aunt and her husband as their extended family and guard-

376 Mass. 252                                    253

Petition of Dept. of Public Welfare to Dispense with Consent to Adoption.

ians, the Probate Court judge, after an even-handed assessment of all the relevant facts, properly determined that the department's plans for adoption served the best interests of each child, and decrees allowing the petitions were affirmed on appeal. [260–262]

State and Federal mandates in the area of child welfare were not inconsistent with Probate Court decrees under G. L. c. 210, § 3, as amended, rejecting proposals of the respondent parents to place their two minor children with their maternal aunt and her husband as the children's extended family and guardians, and allowing petitions of the Department of Public Welfare facilitating adoption of the children. [262–264]

Where evidence amply warranted a finding that the parents of two minor children were unable "to assume parental responsibility" for them, the State's power to intervene to protect them in a manner reflecting, as closely as possible, the precise needs of each individual child was not impeded by any constitutional requirement of due process that the State must prove that the means chosen were those "least restrictive" of parental rights. [264–267]

On evidence on petitions by the Department of Public Welfare under G. L. c. 210, § 3, as amended, reflecting a long history of family difficulties to which the department responded reasonably, the Probate Court judge properly concluded that dispensing with parental consent to the adoption of the respondents' two minor children served the children's best interests, and that agency action with respect to the family was not so arbitrary and irrational as to warrant dismissal of the petitions. [267–269]

Upon petitions by the Department of Public Welfare under G. L. c. 210, § 3, as amended, where all the evidence supported conclusions that the plans submitted by the department for the respondents' two children served the children's best interests and that the petitions should be allowed, there was no abuse of discretion on the part of the Probate Court judge in failing to consider as conclusive expert testimony indicating that, from a psychiatric point of view, the plans submitted by the department were inadequately supported. [269]

PETITIONS filed in the Probate Court for the county of Middlesex on March 8, 1974.

The cases were heard by *Freedman*, J.

After review was sought in the Appeals Court, the Supreme Judicial Court, on its own initiative, ordered direct appellate review.

*Gerald Tutor (Peggy O'Reilly* with him) for the respondents.

*James C. Doyle* for the Department of Public Welfare.

*James M. Cronin* for New Bedford Child & Family Service, amicus curiae, submitted a brief.

HENNESSEY, C.J. The respondent parents appeal from two Probate Court decrees allowing petitions brought by the Department of Public Welfare (DPW) to dispense with parental consent to adoption. The petitions were brought pursuant to G. L. c. 210, § 3, on behalf of the respondents' two minor children.[1]

The DPW originally filed the petitions in March, 1974. In June, 1974, the respondents obtained a continuance so that psychiatric evaluations could be made. In 1975, the judge appointed a guardian ad litem for the children and the cases were again continued pending the guardian ad litem's investigation and report. The petitions were not heard until June, 1976.

By the time of trial, no party contested the DPW's allegations that the respondents were unable "to assume parental responsibility" for their two children. Rather, the question for determination was whether the DPW's plans for adoption represented an appropriate response to this family's situation. The position of the various parties on this issue may be summarized briefly as follows.

According to a plan submitted to the Probate Court pursuant to G. L. c. 210, § 3, the DPW believed that the best interests of each child call for separate placement in

---

[1] General Laws c. 210, § 3, as appearing in St. 1972, c. 800, § 2, provides in pertinent part: "(*b*) The department of public welfare . . . may commence a proceeding, independent of a petition for adoption, . . . to dispense with the need for [parental] consent . . . to . . . adoption . . . . The court shall issue [such] a decree . . . if it finds that the best interests of the child . . . will be served by said decree. . . .

"(*c*) . . . In determining whether the best interests of the child will be served by [such a decree] . . . the court shall consider the ability, capacity, fitness and readiness of the child's parents . . . to assume parental responsibility, and shall also consider the plan proposed by the department . . . ."

different types of environments. According to the DPW, the older child had emotional problems which made a family placement inadvisable. In the opinion of the DPW, this child was in need of a highly structured group setting, a therapeutic environment in which he could work gradually toward permanent placement with an adoptive family. As to the younger child, the DPW thought that a permanent family placement was both possible and highly desirable. The DPW recommended one particular family as "ideal for meeting [this child's] needs," and reported that, on the basis of weekly visits with the child, "a bond of affection is developing both ways."

The guardian ad litem's report, submitted to the Probate Court on June 22, 1976, also concluded that the children should not be returned to the custody of their natural parents. However, the guardian ad litem sharply differed with the DPW's views with respect to placement. The report pointed out that the children's maternal aunt, one Mrs. C, had demonstrated a long-standing interest in the children, and had repeatedly sought custody of both of them. After an investigation, the guardian ad litem recommended placement with the C's, noting that, in such an environment, the children could grow up together, and could remain within the extended family.

The respondent parents also opposed the DPW's plans for adoption, alleging that the agency sought to separate the children permanently—both from their extended family and from each other—without first exploring "less drastic alternatives." The parents agreed with the guardian ad litem that the best placement for the children was with their maternal aunt. To that end, the parents sought a continuance to allow the C's time to file a petition for guardianship, which motion was denied. Additionally, the judge did not permit the appearance of an attorney on the C's behalf.

The judge allowed the DPW's petitions on July 19, 1976, after considering the report of the guardian ad litem, the DPW's plan, and the testimony of several wit-

nesses. At the request of the respondents, however, the judge stayed the decrees pending appeal.

The respondents challenge the judge's decision on several grounds. The parents primarily contend that the ruling below allowed the DPW to separate the children permanently from their family without requiring the agency to explore less intrusive alternatives to adoption. They claim that such a result is inconsistent with the various Federal and State statutes which seek to promote child welfare, not by dispersing, but by strengthening and encouraging the family unit. They further argue that such a result necessarily restricts their fundamental rights to family integrity, thereby violating their rights under the due process clause of the Fourteenth Amendment to the United States Constitution. Second, the respondents claim that the judge erred in denying their motion to appoint an independent psychiatrist to examine the children and the extended family. Third, they assert that the judge abused his discretion by failing to give any weight to the testimony of their expert witnesses.

On November 17, 1977, we transferred the case to this court on our own motion. We note that the case is before us without a report of the material facts. Absent such report, the entry of the final decree in the Probate Court implies that the judge found all facts necessary to sustain it. It is well settled that such implied findings will not be reversed unless plainly wrong. See *Gannon* v. *MacDonald*, 361 Mass. 851 (1972); *Stein* v. *Dornig*, 355 Mass. 797 (1969).

Based on our review of the transcript and exhibits which the parties agreed to include in an appendix, we cannot say that the judge was plainly wrong in determining that adoption is in the best interests of respondents' two children. Nor do we discern any error of law warranting reversal. As will be discussed more fully below, we conclude that the judge correctly applied G. L. c. 210, § 3. We agree with the respondents that the integrity of the

family is due significant statutory and constitutional protection. We do not think, however, that the instant decrees offend against either Federal or State mandates in this area. Accordingly, we affirm.

We summarize the evidence. The respondent parents were married in Massachusetts on March 13, 1967. On February 6, 1968, their first child was born. The report of the guardian ad litem indicates that, by the time the child was six months old, he had been admitted to the Chelsea Naval hospital twice. The evidence shows that on April 12, 1968, the child entered the hospital with a skull fracture, and on August 16, 1968, the child was admitted with a fractured arm.

In September, 1968, the family moved to Harrisburg, Pennsylvania, where the mother and child lived for several months while the father served overseas in the United States Navy. In October, 1968, a neighbor called the Dauphin County Child Care Service to report that the mother had been physically abusive to the child. A series of similar complaints brought visits both from a Child Care Service social worker and from a visiting nurse.

On November 25, 1968, a neighbor reported that another abusive incident had occurred and that the respondent mother had threatened suicide. That same day, the Dauphin County Child Care Service obtained temporary custody of the child and arranged hospitalization for the mother.

While in the hospital, the mother was diagnosed as suffering from a borderline psychosis. She remained in the hospital for approximately two and one-half weeks, during which time her husband obtained an emergency leave from the Navy and returned home. The situation seemed to improve. After her discharge from the hospital on December 12, 1968, the mother continued to receive psychiatric care on an out-patient basis. Both respondents were in frequent contact with the Child Care Service social worker, who reported, on the basis of several interviews, that the mother had "definitely benefited from

[psychiatric] treatment," and that, with continued help, she could make substantial progress "in handling her problems."

In February, 1969, the respondents moved back to the Boston area. The Dauphin County Child Care Service transferred custody of the child to the Division of Family and Children's Services of the Massachusetts Department of Public Welfare, which agency placed the child in Mrs. C's care.

The child was returned to his parents' custody on a trial basis in February, 1970. By this time, however, the parents had separated. The father had moved out of the State and the mother, then expecting a second child, was living with her parents.

On February 17, 1970, the mother gave birth to the respondents' second son. One month later, the second child was admitted to Malden hospital with a fractured arm. The child sustained another fracture on April 19, and was again admitted to the hospital. Approximately one week later, the mother suffered a nervous breakdown, attempted suicide, and entered Metropolitan State Hospital for treatment. She stated that she would kill the babies and was afraid of them.

The DPW obtained temporary custody of the two children in May, 1970, after an ex parte hearing in the Probate Court for Middlesex County. The older child was placed in Mrs. C's care and the younger child remained with his maternal grandparents.

The mother was discharged from the hospital on June 25, 1970, and reunited with her husband early in 1971. With the passage of several months, it was the opinion of the DPW social workers that the respondents had made progress, and were again ready to assume custody of their children.

For approximately ten months after the children were returned to their parents' home, the DPW had no contact with the family. The agency became involved once more in June, 1972, when the older child was admitted to Cen-

tral hospital for second degree burns on both buttocks and for multiple bruises on various parts of his body.

On September 20, 1972, a neighbor called the DPW to report that the younger child had a broken nose. Without verifying this allegation, and presumably on the authority of the May, 1970, custody order, a DPW social worker removed both children from the parents' home and placed them both in foster care. At the request of the parents, the DPW allowed no other relatives to visit the children or to know where the children had been placed. The parents, however, visited the children regularly and arranged to receive counseling at the Somerville Guidance Center.

After a period of several months, the respondents' situation appeared gradually to be improving. The children were returned to their parents' care on October 15, 1973. By the end of November, however, the mother began to experience difficulties again, and sought the DPW's help in placing the children outside the home. After a more urgent call from the mother on December 5, the DPW arranged foster care immediately for both children. In January, 1974, the DPW notified the family that it would seek adoption for the children and began the instant proceedings. Over the objections of the parents, grandparents, and maternal aunt, no further visitations were allowed.

From January, 1974, to the present, both children have been required to adjust to several different temporary environments. Although at first the children were placed together in a family environment, the younger child began to manifest serious behavior problems, which, according to the DPW, required his removal from the foster home. In June, 1974, the younger child was placed in the Nazareth Child Care Center, where he remained until the time of trial, and where, reportedly, he was thriving.

The older child has been in three foster homes since the January, 1974, placement. In 1975, he too manifested serious behavior problems in the foster home. After sev-

eral months of therapy, the child's psychiatrist concluded that "this young man has been emotionally damaged rather severely in his early development. He is very distrustful. . . . [T]here have been difficulties at home with discipline, with alleged stealing and alleged lying. There was also a period of playing with matches and fire setting." This psychiatrist reported that the child could work through his problems most constructively in a group setting. The doctor viewed such an environment as a necessary prerequisite to successful adjustment with a family. He further recommended that if eventual family placement should occur, the child ideally should be placed in an environment which did not include children his own age.

1. Underlying the respondents' statutory and constitutional arguments lies a basic contention that the judge could not properly have found adoption to be in the best interests of the children without considering, or without requiring the DPW to consider, the desirability of alternative placement within the extended family. Consistent with this position are the respondents' claims that the DPW's investigation of the family situation had been unprofessional and inadequate, and that the judge should have ordered further evidence in the form of psychiatric evaluations of the children and extended family.

The importance of such contentions is underlined by our decision in *Adoption of a Minor (No. 2)*, 367 Mass. 684, 688-689 (1975), where, in commenting on the standard to be applied in adoption cases, we stated that " 'the best interests of the child' . . . standard presents the department and the trial judge with a classic example of a discretionary decision. . . . Discretion in this context does not of course mean arbitrary or capricious decision; it calls for decision based on *all* of the relevant facts. Troublesome facts, pointing to a conclusion contrary to that reached by the department or the judge, are to be faced rather than ignored. . . . Only then is the judge's conclusion entitled to the great respect traditionally given to discretionary decisions."

We think that the decrees below reflect an even-handed assessment of all the relevant facts. Important to our conclusion is the observation that the desire of the C's for custody of the children was thoroughly presented to the judge below. The record included an investigation of the C family by the guardian ad litem, as well as a written recommendation that placement with the C family served the best interests of the children. The report and recommendation were supplemented by the testimony of several witnesses, including Mrs. C. Further, the respondents offered expert testimony to support the more general proposition that, all other factors being equal, placement within a child's natural family was preferable from a psychiatric point of view.

However, there was evidence to support the conclusion that, in the particular circumstances of this case, the "less intrusive alternative" proposed by the respondents did not serve the best interests of their children. Experience has shown that, with serious individual emotional problems, the children did not react well together, and in fact had met with great difficulty when placed in the same family environment. There was evidence tending to show that the children's needs were highly specialized— one requiring a family willing to work with supportive educational and mental health services, and one needing a group setting in which he could gradually work toward establishing individual relationships. Placing the brothers together in the C home would have been inconsistent with these considerations. The DPW's plan, on the other hand, was precisely tailored to meet these needs.

Additionally, there was evidence to support the conclusion that the family ties between the C's and the natural parents might indeed have had a negative effect on the children. The evidence revealed a history of animosity between the families and, in particular, hostility between the respondents and Mrs. C. Further, although the C family exhibited genuine concern for the welfare of the children, there was evidence that Mr. C. was hesitant to

take any action which might result in further hostility between the families. Thus, there was testimony that he would "go along with" a guardianship petition, but did not want to adopt the children.

In light of these considerations, we conclude that the judge based the challenged decrees on a proper assessment of all of the relevant facts. We cannot say that he was plainly wrong in determining that the DPW's individualized plans for adoption, rather than the extended family's proposals for guardianship, served the best interests of each child.[2] Where, as here, there was ample evidence to support the conclusion that (1) the respondents were unable "to assume parental responsibility," and (2) that adoption would serve the best interests of each child, the judge properly applied the standards of G. L. c. 210, § 3, in entering the decrees.

2. The respondents contend that the decrees below are inconsistent with both State and Federal mandates in the area of child welfare. They point out that, according to G. L. c. 119, § 1, as appearing in St. 1954, c. 646, § 1, it is the policy of the Commonwealth "to direct its efforts . . . to the strengthening and encouragement of family life . . . and to provide substitute care . . . only when the family itself or the resources available to the family are unable to provide [the child with] the necessary care and protection." See *Petition of the New England Home for Little Wanderers to Dispense with Consent to Adoption* (hereinafter cited as *Petition of the New England Home for Little Wanderers*), 367 Mass. 631, 645 (1975) (applying the policy

---

[2] It is important to note in this regard that the allowance of a petition to dispense with parental consent is *not* a final approval of the DPW's plans. A decree entered pursuant to G. L. c. 210, § 3, serves to "facilitate and expedite the process of adoption of children being held in temporary foster care." *Petition of the New England Home for Little Wanderers to Dispense with Consent to Adoption*, 367 Mass. 631, 637 (1975). The actual adoption proceeding under G. L. c. 210, § 5A, "is separate and must be independently conducted and proved." *Petition of the the Department of Public Welfare to Dispense with Consent to Adoption*, 371 Mass. 651, 656 n.6 (1976).

376 Mass. 252                                    263

Petition of Dept. of Public Welfare to Dispense with Consent to Adoption.

articulated in G. L. c. 119, § 1, to proceedings brought under G. L. c. 210, § 3). The respondents note that similar language appears in the various Federal family welfare programs to which the Commonwealth subscribes.[3] In light of these clear statements of policy, the respondents argue that the judge committed reversible error when he disregarded the respondents' placement proposal and allowed the DPW's petitions.

We do not agree with the respondents' contentions. While the above statements of legislative policy deserve serious consideration "by the department, the agencies, and the courts," see *Petition of the New England Home for Little Wanderers, supra* at 645-646, they do not mandate a result different from the one reached below.

It must be remembered that this is a case where the judge concluded not only that the respondent parents were unable "to assume parental responsibility" for their two children, but also that adoption would serve the children's best interests. It is the very essence of G. L. c. 210, § 3, that the State may intervene in these circumstances. See text of G. L. c. 210, § 3 (*b*), in note 1, *supra.*

Similarly, while it is true that the various Federal statutory schemes require participating States to implement programs encouraging family life, we would be hard-pressed to conclude that, by virtue of such requirements, the Commonwealth is powerless to invade the

---

[3] For example, in 42 U.S.C. § 601 (1970), Congress stated that appropriations to fund the program of Aid to Families with Dependent Children (hereinafter, AFDC) were made "[f]or the purpose of encouraging the care of dependent children in their own homes or in the homes of relatives by enabling each State to furnish financial assistance and rehabilitation and other services, as far as practicable under the conditions in such State, to needy dependent children and the parents or relatives with whom they are living . . . ." Additionally, 42 U.S.C. § 608(f)(1) (1970), requires participating States to develop plans for each child placed in a foster home "to assure that he receives proper care and that services are provided which are designed to improve the conditions in the home from which he was removed or to otherwise make possible his being placed in the home of a relative . . . ."

family milieu when a child's well-being is threatened. The Federal programs to which the respondents refer seek generally to strengthen family life by providing various benefits to needy families. *Black* v. *Beame*, 419 F. Supp. 599, 609 (S.D.N.Y. 1976), aff'd, 550 F.2d 815 (2d Cir. 1977). These programs do not purport to abrogate the States' power to protect the best interests of a child. We think that, within the context of these Federal programs, the State law principle still remains that, "where a child's well-being is placed in issue, 'it is not the rights of parents that are chiefly to be considered. The first and paramount duty is to consult the welfare of the child.' " *Custody of a Minor*, 375 Mass. 733, 749 (1978), quoting from *Purinton* v. *Jamrock*, 195 Mass. 187, 199 (1907). This principle holds true, even if it means, in a particular case, permanent severance from the natural family. See, e.g., *Petition of the New England Home for Little Wanderers*, 367 Mass. 631 (1975); *Adoption of a Minor*, 343 Mass. 292 (1961).

3. We apply similar reasoning to the respondents' constitutional claims. It is well settled that, by virtue of various provisions of the United States Constitution, family relationships are surrounded with an aura of privacy to which the State owes great deference.[4] See, e.g., *Custody of a Minor*, 375 Mass. 733, 748 (1978); *Quilloin* v. *Walcott*, 434 U.S. 246, 255 (1978); *Roe* v. *Wade*, 410 U.S. 113, 152 (1973); *Stanley* v. *Illinois*, 405 U.S. 645, 651 (1972). Indeed, because the interest in family integrity is fundamental in nature, it has been held that certain types of official intrusion into this private realm may be justified only when furthering a "compelling state interest." See, e.g., *Roe* v. *Wade, supra* at 155. But see generally *Maher* v. *Roe*, 432 U.S. 464, 471-477 (1977).

---

[4] Indeed, there is indication that the scope of this constitutional protection does not end with the nuclear family, but encompasses extended family relationships as well. See *Smith* v. *Organization of Foster Families for Equality and Reform*, 431 U.S. 816, 843 n.49 (1977); *Moore* v. *East Cleveland*, 431 U.S. 494, 504-506 (1977).

We think that the State's interest in protecting the welfare of children amply meets this test. See, e.g., *Prince v. Massachusetts*, 321 U.S. 158, 165-166 (1944) (State interest in protection of children found sufficient to override parental claims of both familial privacy and free exercise of religion). Of course, the State may not intrude into the heart of the family relationship "for other than substantial reasons." *Petition of the New England Home for Little Wanderers*, 367 Mass. 631, 645 (1975); *Quilloin v. Walcott*, 434 U.S. 246, 255 (1978). Thus in the context of the application of G. L. c. 210, § 3, we have stated that it is necessary to show that the parents "have grievious shortcomings or handicaps that would put the child's welfare in the family milieu much at hazard." *Petition of the New England Home for Little Wanderers, supra* at 646. Where, as here, such a finding is amply warranted by the evidence, it can hardly be questioned that the state has the power to intervene to protect the children involved.

The respondents suggest that, because fundamental rights are at stake, constitutional requirements of due process are not met unless the State additionally proves that the means chosen to protect its interests are those "least restrictive" of parental rights. We do not agree.

The doctrine of least restrictive alternatives has long served to maximize the expression of protected individual freedoms as against unnecessarily broad governmental encroachment. See, e.g., *Cleveland Bd. of Educ.* v. *La-Fleur*, 414 U.S. 632, 644 (1974) (right of choice in questions concerning childbearing); *Dunn* v. *Blumstein*, 405 U.S. 330, 343 (1972) (right to vote); *Shapiro* v. *Thompson*, 394 U.S. 618, 634 (1969) (right to travel); *NAACP* v. *Button*, 371 U.S. 415, 444 (1963) (freedom of association); *Shelton* v. *Tucker*, 364 U.S. 479, 488 (1960) (freedom of association). Our focus of inquiry necessarily changes, however, where, as here, the State acts not simply as an arm of the majority, but on behalf of a helpless individual within its midst. Where the State enters a family situation to protect the interests of the child, the task is not

simply to find an accommodation between the rights of the individual parents and the interests of society. Contrast cases cited, *supra*. The rights and needs of the child must be considered as well. See, e.g., Note, State Intrusion into Family Affairs: Justifications and Limitations, 26 Stan. L. Rev. 1383 (1974). Accordingly, in such circumstances, the balance to be struck is more complex in nature, see *id.* at 1392-1393, and involves a task to which the doctrine of least restrictive alternatives should not be uncritically applied.[5]

We do not suggest that, when acting on a child's behalf, the State may proceed totally without standards or guidelines. Indeed, we agree that the State is required to make every effort to strengthen and encourage family life before it may proceed with plans to sever family ties permanently. See G. L. c. 119, § 1. Nevertheless, we have long held that, where State intervention is shown to be required, "[t]he paramount consideration [must be] the welfare of the child." *Adoption of a Minor*, 343 Mass. 292, 294 (1961). In this context, the "best interests" determination required by G. L. c. 210, § 3, must reflect much more than the needs of administrative convenience. It requires the departments, the agencies, and the courts "to focus on the various factors unique to the . . . individual for whom it must act." *Custody of a Minor*, 375 Mass. 733, 753 (1978), and cases cited. The State must proceed in a manner reflecting, as closely as possible, the precise needs of the individual child.

Thus we agree that, in certain circumstances, a judge may be warranted in finding that the interests of a child are best served by a placement which is least restrictive of familial rights. Indeed, there is both statutory and common law support for the proposition that, other fac-

---

[5] Mr. Justice Frankfurter's comments in *May* v. *Anderson*, 345 U.S. 528, 536 (1953), are instructive: "Children have a very special place in life which law should reflect. Legal theories and their phrasing in other cases readily lead to fallacious reasoning if uncritically transferred to determination of a State's duty towards children."

376 Mass. 252                                    267

Petition of Dept. of Public Welfare to Dispense with Consent to Adoption.

tors being equal, such a result generally is to be preferred. See, e.g., G. L. c. 119, § 1; *Richards* v. *Forrest,* 278 Mass. 547, 556 (1932).

We decline to hold, however, that, as matter of constitutional law, this must always be the case. "Standards of mathematical precision are neither possible nor desirable in this field; much must be left to the trial judge's experience and judgment. Underlying each case are predictions as to the possible future development of a child, and these are beyond truly accurate forecast." *Petition of the New England Home for Little Wanderers,* 367 Mass. 631, 646 (1975). Guidelines in this area must be flexible enough at least to ensure that the needs and interests of the child are adequately protected.

As discussed in part one of our opinion, we think that the decrees below reflected these standards. There was ample showing not only that the parents were unable to care for their children, but also that their proposal for placement would not further the children's well-being. By contrast, there was basis in the record to conclude that the plans of the DPW accurately reflected the children's many unique individual needs. As such, we do not think that the judge's decisions impermissibly infringed the respondents' constitutional rights.

4. Much is made of the charge that the DPW had done little, if anything, to help the respondents cope with their family difficulties. The respondents seem to argue that, by its failure to provide supportive services to the family, the DPW failed to comply both with the requirements of 42 U.S.C. §§ 601-644 (1970) (the AFDC program), and with the State regulations implementing that program.[6] They also argue that the judge refused to consider these claims, thereby committing reversible error.

We see no merit in these contentions. Contrary to the respondents' arguments, the record clearly indicates that

---

[6] See text of Federal statutes cited in note 3, *supra.* See also, Massachusetts Social Services Policy Manual, 15 Code of Mass. Regs. at 1114.

the judge allowed considerable evidence on the issue of the DPW's performance. There was basis in the record to conclude that this evidence did not warrant the dismissal of the petitions.

Although the record supports the respondents' contention that, at times, the DPW's treatment of the family was perfunctory at best, we think that the agency followed its statutory mandates. There was evidence to indicate that a variety of social service resources had been made available to the family.[7] Further, the evidence shows that, until the decision in 1974 to find adoptive homes for the children, the DPW consistently directed its efforts toward keeping the family together, even in light of the respondents' long history of marital discord and child abuse. In these circumstances, the respondents cannot now claim that, by failing to keep the family intact, the DPW violated the family's rights. "While [the various Federal and State welfare schemes] . . . clearly establish a governmental policy of encouraging family life . . . none of them purport to create an individual right to have that policy perfectly achieved or even pursued in any particular manner." *Black* v. *Beame*, 419 F. Supp. 599, 609 (S.D.N.Y. 1976).

Even if the judge had agreed that the agency should have used better judgment in working with the family, this would not have been dispositive of the issues before him. Under G. L. c. 210, § 3, it is the judge's task to

---

[7] There was evidence that the DPW arranged for such services as day care and foster care for the children, medical care and mental health counseling for the parents, and participation in a Parents Anonymous program (addressing the problem of child abuse). As part of its involvement with the family, the DPW also obtained various professional consultations with respect to various aspects of the family's problems.

The respondents point out that, by its own regulations, the DPW is required to provide many other services as well, including services such as homemaker care and addiction control. There was no basis to infer, however, that such services were at all appropriate in the instant case.

determine (1) whether the parents are able to assume parental responsibility for their children, and (2) whether dispensing with parental consent to adoption served the best interests of the children. While there may be cases in which agency action with respect to a family has been so arbitrary and irrational as to warrant a dismissal of the child custody petition, see, e.g., *Wilson* v. *Family Servs. Div., Region Two*, 554 P.2d 227 (Utah 1976), we think the judge properly could have concluded that this was not such a case. The evidence reflected a long history of family difficulties to which the DPW was required to respond. There was testimony to support the conclusion that, even in crisis, the agency responded reasonably.

5. The respondents argue finally that the judge abused his discretion by failing to consider expert testimony which indicated that, from a psychiatric point of view, the plans submitted by the DPW were inadequately supported. We agree with the respondents that psychiatric opinion evidence may be extremely valuable in cases concerning child custody. See, e.g., *Adoption of a Minor*, 338 Mass. 635, 643 (1959). We do not think that the judge abused his discretion by refusing to give the expert testimony conclusive effect in this case.

First, it is well settled that evidence is not binding on the judge simply because it is offered by an expert. See *Custody of a Minor*, 375 Mass. 733, 756 n.13 (1978). Second, even if the expert testimony had been fully accepted, we do not think that it was necessarily conclusive of the issues raised. The judge may have believed the expert testimony that the DPW's assessment of the family situation was not based on adequate investigation. In making his ultimate determination, however, the judge was required to consider all the evidence. As discussed, *supra*, this evidence supported the judge's conclusion that the petitions should be allowed.

*Decrees affirmed.*