NOTICE: Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale. Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent. See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

23-P-314

ADOPTION OF JADEN (and three companion cases[1]).

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

The mother, the father, and the two oldest children, Jaden and Alex, appeal from decrees entered in the Juvenile Court finding the parents unfit and terminating their parental rights to the children.[2] They argue that the finding of unfitness was not supported by clear and convincing evidence and that the judge abused his discretion in terminating the parents' rights. The father, Jaden, and Alex also argue that the Department of Children and Families (DCF) failed to provide adequate adoption plans, and that the judge erred in declining to order posttermination and postadoption visitation.[3] Finally, both

---

[1] Adoption of Alex, Adoption of Kerrianne, and Adoption of Lexy. The children's names are pseudonyms.

[2] The mother was the sole parent identified on Lexy's birth certificate. The judge terminated the parental rights of "any unknown, named, and unnamed father" of Lexy.

[3] The father adopts the arguments in the mother's brief and in Jaden's (and Alex's) brief.

parents raise arguments grounded in alleged deprivations of due process.  We affirm.

Background.  We summarize the judge's findings of fact, which find ample support in the record.[4]  The mother and father began a relationship in 2011.  The four subject children in this matter are Jaden, born in 2013; Alex, born in 2016; Kerrianne, born in 2018; and Lexy, born in 2020.  Before moving to Massachusetts, Jaden was born substance exposed in Connecticut.[5]

DCF became involved with the family in 2017.  Between May 2017 and March 2021, nine G. L. c. 119, § 51A, reports (51A reports) were filed, alleging neglect and physical abuse of the children.  DCF supported seven reports, which involved, inter alia, Lexy testing positive for cocaine at birth, the mother physically assaulting the father in front of the children, substance use occurring at the home, the mother choking Jaden, and concerns about the mother's mental health and substance use. In August 2020, DCF created a safety plan with the father, in which he agreed that the mother was not to be the sole caregiver

---

[4] General Laws c. 119, § 51A, reports were admitted in evidence solely "to set the stage," and G. L. c. 119, § 51B, reports were considered by the judge "for statements of fact . . . and not for purposes of diagnosis, prognosis and evaluation."  See Custody of Michel, 28 Mass. App. Ct. 260, 266-267 (1990).

[5] In 2017, the mother's parental rights to a child from a previous relationship were terminated in Connecticut.

2

of the children and that he would ensure that the home was free of illegal substances.  The parents did not follow the safety plan.  A February 27, 2021, report alleged that there was drug activity occurring in the apartment, that people were "passed out" several days a week, that the mother often arrived home intoxicated, and that the mother sometimes drove under the influence with the children in the car.

DCF filed the instant care and protection petition on March 18, 2021.  The children were placed in the conditional custody of the mother and the father.  During that time period, six additional 51A reports were filed, alleging neglect of the children by the mother and the father due to the children not attending school, a lack of supervision of the children, the mother's use of substances in the home, and Jaden testing positive for cocaine.[6]  On May 24, 2021, the children were removed from the mother's and the father's custody and placed in DCF care.

---

[6] On May 23, 2021, two 51A reports were filed.  The first alleged that Kerrianne was able to access the mother's Suboxone from her purse and may have ingested it.  The second alleged that the mother hid a substance in the home and was "acting erratically."  During the ensuing G. L. c. 119, § 51B, investigation, the father admitted that the children were not always supervised.  The mother refused to sign releases for DCF to speak with her substance abuse treatment providers, and DCF later learned that she was no longer in treatment.

Following removal, the mother and the father struggled to make progress on the action plan tasks that DCF assigned them.[7] The mother did not take any steps to address her substance use or mental health issues. She "called the police to arrest" a DCF worker, sent threatening e-mails to DCF, and appeared to be under the influence during two visits with the children. At the time of trial, she had open warrants on seven charges. The father also failed to make progress on his action plan tasks. Police were called to the home on three occasions, yet both parents refused to engage in recommended domestic violence services. The parents often failed to confirm or attend visits with the children, and they did not attend any visits between October 2021 and June 2022.[8] The father later resumed visitation and began meeting with DCF, but he still had not made any progress on his action plan tasks.

---

[7] As part of the mother's action plan, DCF recommended that the mother confirm visits with the ongoing social worker; confirm and attend visits in the DCF office; complete a substance abuse evaluation, a mental health evaluation, and toxicology screens; and attend individual therapy and psychiatry. The father's action plan tasks required the father to, inter alia, meet with the DCF social worker at least monthly, complete a substance use evaluation and a mental health evaluation, engage in individual therapy, and attend all virtual and in-person visits. By October 7, 2022, neither parent had made progress on their tasks.

[8] When the father did attend visits with the children, he was observed to be "loving and attentive."

4

On November 1, 2022, trial commenced via Zoom on DCF's request to terminate the mother's and the father's parental rights. The father did not appear, and the judge allowed his counsel's oral motion to withdraw.[9] The judge also conducted a colloquy with the mother, who had been proceeding pro se since January 2022.[10] The mother said that she felt "mentally anguished" and "forced" to represent herself due to "malpractice" by her previous attorneys. The judge stopped the colloquy, allowed her to speak to standby counsel twice, and offered to appoint an attorney to represent her. After a third conversation with standby counsel, the judge continued with the colloquy, and the mother confirmed her decision to proceed pro se with standby counsel. The judge accepted her waiver of counsel and found that it was made "voluntarily[,] intelligently and with knowledge of the consequences." On the second day of trial, the mother did not appear. After efforts to contact her were unsuccessful, the trial proceeded without her.

---

[9] On several prior court dates, the father's counsel reported having "no position" from him. The judge had allowed the father's counsel to withdraw on June 22, 2022, but reappointed counsel on October 11, 2022, because the father had attended some visits.

[10] On January 14, 2022, the judge found that the mother's waiver of counsel was made "voluntarily, intelligently, and with knowledge of its consequences."

5

Following trial, the judge ordered the entry of decrees finding the mother and the father unfit and terminating their parental rights.[11]  He approved the adoption plans proposed by DCF and ordered sibling visitation, but left posttermination and postadoption visitation with the parents to the discretion of DCF for Jaden and Lexy, and to the discretion of the maternal aunt for Kerrianne.[12]

Discussion.  1.  <u>Unfitness and termination of parental rights</u>.  The mother, the father, Jaden, and Alex contend that DCF did not meet its burden to prove parental unfitness by clear and convincing evidence.[13]  We disagree.

"To terminate parental rights to a child and to dispense with parental consent to adoption, a judge must find by clear and convincing evidence, based on subsidiary findings proved by at least a fair preponderance of evidence, that the parent is unfit to care for the child and that termination is in the

_____

[11] The judge issued his decision on November 3, 2022, but DCF had not yet filed a birth certificate for Alex.  The judge issued an amended decision and order on December 8, 2022.  On February 15, 2023, after DCF filed the birth certificate, the judge issued his findings of fact, rulings of law, and orders regarding all four children.

[12] The judge did not make orders regarding visitation with Alex.

[13] The father, Jaden, and Alex do not challenge any of the judge's findings as clearly erroneous.

6

child's best interests." Adoption of Jacques, 82 Mass. App. Ct. 601, 606 (2012). "Parental unfitness is determined by considering a parent's character, temperament, conduct, and capacity to provide for the child's particular needs, affections, and age." Care & Protection of Vick, 89 Mass. App. Ct. 704, 706 (2016). We give substantial deference to the judge's findings, which we do not disturb unless they are clearly erroneous. See Adoption of Jacques, supra at 606-607.

The evidence at trial supported the judge's findings that the mother: exposed Jaden and Lexy to substances during pregnancy; exposed the children to substances while caring for them; physically abused Jaden; refused to engage in substance abuse and mental health treatment; assaulted the father and failed to engage in domestic violence services; and failed to confirm or attend visits with the children. The record supports the judge's findings that DCF proved by clear and convincing evidence that the mother is unfit.[14]

---

[14] The mother also challenges the judge's findings regarding her mental health. She argues that the record does not support the judge's finding that her behavior demonstrated "mental instability." The argument is unpersuasive. In addition to his observations of the mother throughout the proceedings, the judge considered, inter alia, the mother's inappropriate conduct towards DCF, her interview with a court investigator where she appeared "paranoid," and her failure to engage in mental health services. The judge's findings were supported by the record and not clearly erroneous. See Custody of Eleanor, 414 Mass. 795, 799 (1993).

As to the father, the evidence demonstrated that he showed "a level of instability and lack of safety that do not serve the best interests of the children." While he was meant to be the primary caregiver according to the safety plan, the children were exposed to dangerous substances, were not adequately supervised, and were not attending school. After the children were removed, he did not attend consistent visits or engage in the action plan tasks. Between his inability to ensure the safety of the children while they were in his care and his failure to demonstrate improvement after their removal, we discern no error in the judge's determination of unfitness.

As to termination of parental rights, the judge evaluated the provisions of G. L. c. 210, § 3 (c), and found factors (ii), (iii), (iv), (v), (vi), (vii), (viii), (x), and (xii) to be applicable. The record supports this determination. Moreover, as detailed above, in light of each parent's failure to meaningfully address the issues that led to the removal of the children, there was ample record evidence to support the judge's findings and determination that the mother and the father were unfit, and that termination of their parental rights was in the children's best interests.[15]

_____

[15] We are not persuaded by the father's, Jaden's, and Alex's argument that the judge's findings were not sufficiently "child-specific." The key elements of the parents' unfitness applied to their inability to parent each of the children. Moreover,

8

2. Adoption plans. The father, Jaden, and Alex claim that the judge erred in terminating parental rights because DCF did not present adequate adoption plans for Jaden, Alex, and Lexy.[16] "In determining the best interests of the child, the judge must consider, among other things, 'the plan proposed by the department.'" Adoption of Varik, 95 Mass. App. Ct. 762, 770 (2019), quoting G. L. c. 210, § 3 (c). "The law does not require that the adoption plan be fully developed in order to support a termination order, but it must provide sufficient information about the prospective adoptive placement so that the judge may properly evaluate the suitability of the department's proposal" (quotations and citation omitted). Adoption of Varik, supra.

While DCF did not submit written adoption plans or identify adoptive placements for Jaden, Alex, or Lexy, the DCF social worker testified that the plan for the children was adoption. She testified that Lexy was receiving early intervention and was in a "comprehensive foster care home," and that a cousin in

_____

the judge made numerous factual findings and conclusions about the individual needs, placements, and progress of both Jaden and Alex.

[16] Kerrianne and Lexy argue in their brief that the father "does not have standing to argue any issue to [Lexy] where he is not listed on her birth certificate." The father does not address that argument in his reply brief. Even assuming, arguendo, that the father does have standing, the outcome is no different.

Virginia was a potential placement. She also testified about how Jaden and Alex were doing in their foster home, their specific needs, and the services they were receiving to aid their transition. Based on this evidence, the judge made specific findings about each child's needs and the type of caregiver and home they will require. The adoption plans "convey[ed] enough information for the judge to assess the various options that [DCF] was actively considering." Adoption of Varik, 95 Mass. App. Ct. at 771.

3. Posttermination and postadoption visitation. The father, Jaden, and Alex contend that the judge abused his discretion in declining to order posttermination and postadoption visitation between the father and Jaden and Alex.[17] Once a parent is established as unfit, "[a] judge may decline to order postadoption visitation, or may order limited postadoption contact, including visitation, between a child and biological parent where such contact is currently in the best interests of the child" (quotation and citation omitted). Adoption of Saul, 60 Mass. App. Ct. 546, 556 (2004). The record reflects the

---

[17] At trial, the father did not appear, and neither Jaden nor Alex requested posttermination and postadoption visitation. See Adoption of Gillian, 63 Mass. App. Ct. 398, 408 (2005) (issue of visitation waived where parents did not raise it prior to termination of their parental rights). Even assuming the issue is not waived, we discern no abuse of discretion for the reasons discussed herein.

10

father's failure to ensure the safety of the children, engage with action plan tasks, and attend consistent visits. On the record before us, we cannot say that the judge abused his discretion in declining to order posttermination and postadoption visitation with the father. See L.L. v. Commonwealth, 470 Mass. 169, 185 n.27 (2014).

4. Due process. The mother and father also raise various claims of due process violations. These claims are unavailing for the reasons discussed below.

a. The mother's waiver of counsel. The mother contends that the judge erred in accepting her waiver of counsel because he harbored "bona fide doubts" about her competence to do so. We disagree. In parental termination proceedings, we look to the criminal law for guidance in assessing whether a waiver of the right to counsel was valid. See Adoption of William, 38 Mass. App. Ct. 661, 663-664 (1995). Before accepting a waiver of counsel, the judge must "determine both that the waiver is knowing and voluntary and that the defendant is competent to make it." Commonwealth v. Haltiwanger, 99 Mass. App. Ct. 543, 555 (2021), citing Godinez v. Moran, 509 U.S. 389, 400-401 (1993). To conclude that a waiver was valid, "[w]e must be confident that [she] was adequately aware of the seriousness of the [proceedings], the magnitude of [her] undertaking, the availability of advisory counsel, and the disadvantages of self-

11

representation" (quotation and citation omitted).  Care &
Protection of Ollie, 104 Mass. App. Ct. 269, 274 (2024).  The
competence that is required to waive the right to counsel is the
competence to waive the right, not the competence to represent
oneself.  See Haltiwanger, supra.  We review claims of
violations of the right to counsel de novo.  See Commonwealth v.
Means, 454 Mass. 81, 88 (2009).

In Haltiwanger, we ruled that a judge who has a bona fide
doubt about a defendant's competence to waive counsel is
obligated to conduct a separate inquiry into the question, on
the record and accompanied by written findings.  Haltiwanger, 99
Mass. App. Ct. at 556-557.  The judge in Haltiwanger "sua sponte
raised a concern about the defendant's competency" to stand
trial because the defendant, during a colloquy, was
uncooperative, provided nonsensical answers, and refused to have
standby counsel appointed.  See id. at 554, 557, 559.  Here, the
judge conducted three comprehensive colloquies with the mother.
Moreover, at the slightest hesitation from her, he stopped the
colloquy, offered to appoint counsel, and allowed her to have
three conversations with standby counsel.  Only then did the
judge accept her waiver and make a finding on the record that it
was made "voluntarily, intelligently and with knowledge of the
consequences."  Neither the judge, nor standby counsel,
expressed any doubts about her competency, and her "unaddressed

12

mental health condition" was only a concern in the context of her parental fitness.  See Indiana v. Edwards, 554 U.S. 164, 175 (2008) ("Mental illness itself is not a unitary concept").  We discern no error in the judge's finding that the mother's waiver was knowing, intelligent, and voluntary.

b.  Failure to continue the trial.  The mother also contends that the that the judge "should have postponed the trial" after she did not appear on the second day.  "The decision on whether to continue any judicial proceeding is a matter entrusted to the sound discretion of the judge, and the judge's decision will be upheld absent an abuse of that discretion."  Adoption of Gillian, 63 Mass. App. Ct. 398, 409-410 (2005).  The judge did not abuse his discretion in proceeding without the mother.  She participated during the first day of trial and had been participating virtually since the beginning of the proceedings.[18]  She declined the opportunity to appear in person, and there has been no indication or proffer -- at trial or on appeal -- that her failure to appear on the second day of trial was due to technology issues or anything apart from her unilateral choice not to participate.  Contrast Adoption of Patty, 489 Mass. 630, 644-646 (2022) (judge abused discretion in drawing adverse inference against parent for not

---

[18] On several occasions, the mother was able to reconnect after disconnecting and utilize virtual, breakout rooms.

13

participating in video conference trial, where parent's absence was attributable to inadequate explanation of video technology).

c. Termination of the father's parental rights to Alex. The father claims that the judge's "sua sponte" termination of his parental rights to Alex constituted a due process violation. This argument is likewise unavailing because the trial in November 2022 proceeded as to all four children, and, as discussed supra, involved ample evidence of the father's unfitness. At the end of the second day of trial, the judge informed the parties that he would issue a decision as to Alex after DCF filed a birth certificate. No party objected to the process chosen by the judge. The father had an opportunity to be heard in a meaningful time and manner throughout trial with respect to Alex. See Care & Protection of Quinn, 54 Mass. App. Ct. 117, 122 (2002). There was no error.

d. The father's right to counsel. Finally, the father argues that he was denied due process when the judge allowed his counsel's oral motion to withdraw at trial. We disagree. Indigent parents have a constitutional right to counsel in a proceeding brought to terminate their parental rights. See Adoption of William, 38 Mass. App. Ct. at 663. The right is not absolute, however, and can be lost if the parent abandons the proceedings. See Care & Protection of Marina, 424 Mass. 1003, 1003-1004 (1997). The father's counsel was unable to provide a

14

position on the father's behalf throughout the proceedings due to the father's failure to communicate with her. The father then failed to attend trial or communicate with his counsel, thereby abandoning the proceeding and his right to counsel. See id. (despite involvement in initial stages of proceeding, father's failure to attend later hearings and trial constituted "absolute abandonment" of proceeding and right to counsel).[19]

Conclusion. The record and the judge's detailed and comprehensive findings compel the conclusion that the decrees "reflect an even-handed assessment of all the relevant facts," Petition of the Dep't of Pub. Welfare to Dispense with Consent to Adoption, 376 Mass. 252, 261 (1978), and that the judge did not err or abuse his discretion in finding the mother and the father unfit, terminating their parental rights, and declining

_____

[19] Raised for the first time on appeal, the arguments of Jaden, Alex, and the father about the Family Treatment Court were not properly preserved in the trial court, and are therefore not before us. See Adoption of Yalena, 100 Mass. App. Ct. 542, 554 (2021).

to order posttermination and postadoption visitation with the father.

Decrees affirmed.

By the Court (Vuono, Neyman & D'Angelo, JJ.[20]),

*Paul Little*

Clerk

Entered: October 7, 2024.

---

[20] The panelists are listed in order of seniority.

16