PETITION OF WORCESTER CHILDREN'S FRIEND SOCIETY TO DISPENSE WITH CONSENT TO ADOPTION.

Worcester. March 19, 1980. — April 16, 1980.

Present: BROWN, PERRETTA, & DREBEN, JJ.

*Adoption. Practice, Civil*, Relief from judgment. *Probate Court*, Findings by judge, Judicial discretion.

In a proceeding to dispense with parental consent to the adoption of a child, the judge's conclusion that the mother was currently unfit to care for her child because she suffered from latent schizophrenia was not warranted where there was no evidence that, at the time of the trial, the mother suffered from the illness which had been diagnosed some two years earlier and where there was evidence that the mother had apparently enjoyed good health for at least the nine months prior to the trial. [599-600]

Where the evidence at a trial on a petition to dispense with parental consent to the adoption of a child was inadequate to resolve the issue of the current fitness of the mother to care for her child and the judge's findings did not support his conclusion that she was currently unfit because she suffered from latent schizophrenia, the judge erred in refusing to consider evidence proffered in an affidavit by a psychiatrist who had examined the mother subsequent to the trial, which was offered in support of the mother's motion for relief from the judgment pursuant to Mass.R.Civ.P. 60(b)(2) and (6). [600-601]

A judge should not have applied the recognized restrictions on relief under Mass.R.Civ.P. 60(b) to a motion by a mother in a proceeding to dispense with parental consent to adoption. [602]

PETITION filed in the Worcester Division of the Probate and Family Court Department on October 16, 1978.

The case was heard by *Conlin*, J.

*Diane F. Paulson* for the defendant.

*Amy L. Mower* for the plaintiff.

PERRETTA, J. The defendant mother appeals from a judgment, and an order denying her motion for relief from judgment, Mass.R.Civ.P. 60(b)(2) and (6), 365 Mass. 828, 829

(1974), allowing the adoption of her child without her consent. G. L. c. 210, § 3, as amended through St. 1978, c. 552, § 36. Because of the nature of the controversy and "for the sake of expediency in an already lengthy proceeding," after oral argument we entered an order on March 26, 1980, reversing the judgment and the order of denial and remanded the matter for a new trial without an accompanying opinion. *School Comm. of W. Springfield* v. *Korbut*, 373 Mass. 788, 790 (1977).

The issue presented by this appeal is whether the evidence and the findings persuasively demonstrate that the mother, who "is a fine decent person," who "loves her child" and who wishes to care for her; suffers from latent schizophrenia, an illness which limits her parental abilities. The judge found that the mother currently suffers from this illness and that as a result of it, she is unable to provide stability and continuity for her child, who has a special need because of a "developmental delay" of approximately six months. We recite the basis of our decision, noting from the outset that "[i]n invoking the 'best interests of the child' the Legislature did not intend to disregard the ties between the child and its natural parent, or to threaten a satisfactory family with loss of children because by reason of temporary adversity they are placed in foster care. A parent cannot be deprived unless some affirmative reason is shown for doing so such as a finding of a serious problem with that parent." *Petition of New England Home for Little Wanderers*, 367 Mass. 631, 641-642 (1975).

The mother is twenty-four years old and has never married. She was unaware that her own mother was alive until she was thirteen, and she appears to have been without warmth and affection during her childhood. She resided with her father and her uncle, and after her daughter was born in 1976, she continued to live with them. The state provided her with financial assistance through A.F.D.C., but with no other social services. Soon after the birth of her child, she enrolled in a special program for young mothers. It was her daily routine to travel by bus, with her child, to

the program's facility, which included a child day-care center, and she would spend the day at this facility. When she had one month remaining to complete the program, her father died. This event, coupled with the demands of her daily activities, caused the mother to fall into a state of severe depression in July of 1977. At this time she contacted the plaintiff agency and requested that the plaintiff care for the child while she voluntarily entered a hospital. She remained in the hospital for three days, reclaimed her child, and returned home. The plaintiff provided the mother with a social worker, who attempted to assist her in reestablishing the routine of her life with its daily demands. Some time during that summer, the mother's uncle died. In August of 1977, the mother again entered a hospital and voluntarily left her child with the plaintiff.

The mother was treated by Dr. Hernando Romero. At the trial in 1979, he testified that at the time of the August, 1977, hospital admission she was suffering from movement disorders (she could not sit still, relax, or sleep), she had facial tics, and her emotional responses were inappropriate. He diagnosed her as suffering from latent schizophrenia, and he prescribed medication to diminish her hyperactivity. From the outset the mother complained that this medicine made her tired and her muscles stiff, and she requested a drug which would calm her without these side effects. Dr. Romero advised her that the medicine was doing exactly what it was intended to do. He explained to her that a feature of the illness was that the medicine would produce health to the point where the patient would feel it was no longer necessary and stop taking it. Should she stop her medication, a relapse would occur within a few days. He warned her that she must continue taking it. The mother remained in the hospital until October, when she refused to accept long term care at a State hospital. In preparing for her discharge, Dr. Romero recommended to her that she should have someone else care for her child for a while so that she could benefit from being free of the demands of parenthood and work towards an ultimate reunion with her

daughter. The mother took this advice and upon leaving the hospital she lived apart from her child, who was in a foster home. Although the mother did not thereafter see Dr. Romero for further treatment, she had regular appointments with his nurse, who reported in writing to Dr. Romero concerning the mother's progress and condition. In addition, the plaintiff's social worker continued to work with the mother. Both the nurse and the social worker noted that the mother was not maintaining a daily routine, that she was unable to organize her budget or make future plans, that she was not attentive to her personal appearance and hygiene, and that she continued to complain about her medicine. The mother visited with her daughter, and in January of 1978 the plaintiff made arrangements for the mother and her child to reside together in a foster home. The mother continued with her medication; she also continued to see Dr. Romero's nurse and the plaintiff's social worker. Their observations of, and comments about, the mother's condition remained the same. The foster mother assisted the defendant with her child. She testified that the defendant was loving and caring to her child, that she followed suggestions concerning the child, and that her daily routine was identical to that of the child's; she would feed her and play with her, and when the child slept, so did the mother.

On June 18, 1978, the mother again hospitalized herself. On that day she saw and spoke with Dr. Romero for about half an hour. When the mother left the hospital on July 23, 1978, she did not return to the foster home and her child. Instead, she secured employment as a nurse's aide and resided at the Y.W.C.A. She remained there for a short time while she saved the necessary money for a security deposit on an apartment. When she had saved enough, she moved to an apartment, in which she still resides, that has adequate space for her and her daughter. She selected this apartment because, in addition to its affordable rent, it has an on-premises day-care center. During this period she ceased taking her medication, seeing Dr. Romero's nurse,

and working with the plaintiff's social worker. She visited with her daughter, taking her for walks or back to her apartment. The plaintiff would not allow overnight visits. The foster mother testified that the mother would return the child on time and that the child's condition was fine after each visit.

In 1977, the mother was administered intelligence tests while hospitalized. Her scores indicated that she suffered from borderline retardation. Recent intelligence tests show that she is well within the normal range and that she has the ability to understand the special problems of her child; the tests cannot indicate whether she has the ability to resolve them. The mother testified that if her child is returned to her, she will seek any assistance necessary to provide the best possible care for her child, as she is her major concern.

Expert testimony and other evidence show that the child is delayed in her development by six months. It has not been determined if the cause of this delay is environmental or congenital. Neither the child's condition nor her special needs are disputed. If she is to experience a normal development, she must be provided with an environment that is marked by stability and continuity. The plaintiff plans to place the child with specific prospective adoptive parents who have proven abilities in meeting needs such as those of this child. The child has not met these people, and, therefore, close ties or bonds to them do not exist.

Dr. Romero testified that the mother cannot provide the child with stability and continuity. Based upon his treatment of the mother in 1977, his conversation with her in June of 1978, and the written reports from his nurse which ended in June of 1978, he described the mother's current condition as being one of an inability to organize herself or her life, a childish treatment of her problems, occasional inappropriate emotional responses, and anxiety in respect to major decisions concerning her child. He stated that she would suffer relapses of her "latent" schizophrenia and that these relapses would be triggered by her anxiety over her inability to cope with her child. He concluded, therefore,

that the mother could not be supportive of the child, and "I think that the child is going to suffer."

At the conclusion of the trial, and based upon the evidence elicited, the judge made the following critical findings: that the mother suffered and continues to suffer from "latent" schizophrenia; that one aspect of this illness is a recurring pattern of psychologically healthy and psychologically unhealthy periods; that this recurring pattern exists in the history of the mother's illness; and that she probably will not recover. The judge further found that due to her illness, the mother has limited ability, capacity and fitness to care for a normal or a developmentally delayed child. He concluded that because the mother's "latent schizophrenia and evidenced lack of parenting ability" would cause a risk to the child's welfare, it is in the best interest of the child to allow the adoption without the mother's consent.

These findings do not indicate that the limitations of the mother's parental abilities can be attributed to a cause other than her illness which was diagnosed in 1977. However, the mother's illness must be shown to be current to be a basis for the "evaluation of the welfare of the child in reference to the present and the future." *Custody of a Minor,* 5 Mass. App. Ct. 741, 749 (1977). *Custody of a Minor (No. 1),* 377 Mass. 876, 880 (1979). The findings do not show that the mother is currently ill. The evidence as to whether her current good health is part of a pattern of healthy and unhealthy periods is in serious conflict, and there are no findings which persuasively show that her current good health is a mere phase of an ongoing schizophrenic condition. Dr. Romero had warned the mother that if she ceased taking her medication upon feeling well, she would experience a relapse within a few days. The mother ceased taking her medication after July, 1978; there is no indication in the record that she has had a relapse, and Dr. Romero has had no occasion to examine her since June, 1978. The mother's limitations as described by Dr. Romero, his nurse, and the plaintiff's social worker, were documented as existing during the time she was taking her medication and complaining

that the medication was preventing her from functioning in a normal manner. There is no substantiation that these limitations existed after July, 1978. These crucial indications of good health, and the absence of evidence and detailed findings explaining them, require that we conclude that the findings made by the judge do not "demonstrat[e] that close attention has been given the evidence and that the necessity of removing the child from . . . her [mother] has been persuasively shown." *Custody of a Minor (No. 1)*, 377 Mass. 876, 886 (1979). *Custody of a Minor (No. 2)*, 378 Mass. 712, 722 (1979).

Our conclusion is buttressed by information set out in an affidavit attached to the mother's motion pursuant to Mass. R.Civ.P. 60(b) (2) and (6), which she filed two months after the entry of the judgment allowing the plaintiff's request to dispense with the need of her consent to the adoption. In the motion she alleged that subsequent to the hearing, she was able to discover a psychiatrist willing to examine her and that she had been unable to do so prior to the hearing.[1] An affidavit from the psychiatrist and her professional resume were attached to the motion. The affidavit recited that the psychiatrist conducts about 3,000 patient interviews a year; of these patients, 1,000 to 1,500 have some form of schizophrenia. The affidavit stated that on May 12, 1979, she conducted a lengthy interview of the mother and reviewed her personal history and records. She recited the facts she had gleaned from this process, and she stated that she found no evidence "of any sort of schizophrenic process whatsoever, including latent schizophrenia," nor did she find evidence of border line retardation. To the contrary, the psychiatrist found the mother to be a person of average intelligence who had suffered hysterical symptoms which

---

[1] At oral argument counsel for the mother stated to this court that all prior attempts to secure psychiatric evaluations and evidence were unsuccessful due to the mother's inability to incur the expenses involved. While the motion does not set out these facts in explanation of the mother's prior inability to discover this psychiatrist, her limited financial resources are well documented and supported by the record.

had arisen to ward off the intolerable feelings she experienced upon the loss of her father and upon the threatened loss of her child. She saw nothing that indicated that the mother could not take care of her child as well as any ordinary person could. She recommended that the mother undertake psychiatric therapy to understand the feelings which led to her attacks and to help prevent them.

The judge should not have denied the motion, because the proffered evidence demonstrated that it was imperative to resolve the questions that his previous findings had not and could not have answered on the basis of the evidence at the time of the judgment. In denying that motion the judge made further findings which are based upon the same defects that we have found in the original findings. He found that under both rule 60(b) (2) and (6), the mother had to show that this newly discovered evidence "would in all probability lead to judgment in her favor." He found that she could not do this because even if the evidence removed the effect of Dr. Romero's testimony, it would be unlikely that the outcome would change, "as the [plaintiff's] case did not rest solely" on his testimony. However, as we have indicated, the plaintiff's case on the issue of the mother's illness rests on evidence that does not go beyond July of 1978. Thus, the new evidence was not as limited in its scope and impact as the judge appears to have thought. Additionally, he said that the evidence would not alter the conclusions he had reached on the issues of the child's needs, and the appropriateness of the plaintiff's plan for the child. The child's needs, however, have never been disputed or questioned; the issue was and is whether the mother has a serious problem which prevents her from meeting those needs. The appropriateness of the plaintiff's plan is of no consequence if the mother possesses the ability, capacity, fitness and readiness to rear her child. We do not intimate that this evidence will alter the outcome of the case upon further proceedings. We conclude only that because of the evidence at the time of the trial and the inadequacy of the findings, the evidence offered in the affidavit should have been considered.

The judge also concluded that the evidence was not "newly discovered" as required by rule 60(b) (2) and that rule 60(b) (6) could not be relied upon to circumvent that requirement. In his discretion and in reliance upon *Trustees of Stigmatine Fathers, Inc.* v. *Secretary of Admin. & Fin.*, 369 Mass. 562, 565-566 (1976), and *Artco, Inc.* v. *DiFruscia*, 5 Mass. App. Ct. 513, 516-518 (1977), he denied the motion. We need not consider whether the evidence was newly discovered because the judge should not have applied the recognized restrictions of rule 60(b) relief. Confinement to procedural boundaries cannot have priority over the concern at stake in proceedings to determine the best interests of a child. "Where constitutional rights hang in the balance, a greater level of factual inspection has sometimes been required in civil cases as an additional safeguard against improvident judicial action. . . . Indeed, we believe that important personal rights, such as those involved when the breakup of a family is threatened, warrant an extra measure of evidentiary protection." *Custody of a Minor (No. 1)*, 377 Mass. at 884. We regard this holding, made on the question of the burden of proof in proceedings of this nature, to apply with equal force to the present issue. The mother's ability to present the evidence sooner was diminished by her financial situation (see note 1, *supra*); the evidence was diligently presented upon its discovery, which was close in time to the judgment; and, it was presented before the plaintiff caused the child to meet or form a bond with the selected adoptive parents. In view of these facts and the nature of the offered evidence, the best interests of the child require consideration of the entire case in light of all the available evidence of the mother's present condition. We leave it to the judge whether his opinions in this matter are now so firm as to indicate he should recuse himself.