PETITION OF THE DEPARTMENT OF SOCIAL SERVICES TO
DISPENSE WITH CONSENT TO ADOPTION.

Hampden. June 13, 1983. — September 7, 1983.

Present: BROWN, PERRETTA, & KASS, JJ.

*Adoption,* Dispensing with parent's consent.

Where the record in a proceeding to dispense with a putative father's con-
sent to the adoption of his daughter did not support the judge's conclu-
sion that the child's best interests would be served by adoption by her
foster parents, based on the lengthy separation of the child from her
father, and where it appeared that the judge had not considered the
possibility of custody by the foster parents with present or future
visitation rights by the father, this court remanded the matter for fur-
ther findings. [609-613]

PETITION filed in the Probate Court for the county of
Hampden on September 29, 1977.

The case was heard by *Sacco, J.*

*J. Arthur Hickerson* for the father.

*Judith S. Yogman,* Assistant Attorney General, for
Department of Social Services.

BROWN, J. This is an appeal by the putative biological
father (the only interested parent) from a decree of the Pro-
bate and Family Court allowing a petition of the Depart-
ment of Social Services (Department), pursuant to G. L.
c. 210, § 3, to dispense with the need for his consent to the
adoption of his putative daughter. In addition to refusing
to consent to the adoption, the putative father seeks "to
adopt the child, or at least be granted visitation rights."

In proceedings under G. L. c. 210, § 3, the paramount
consideration must be the future welfare of the child. Thus
the crucial question for the Probate Court and this court in
these matters is "whether the [biological] parents are cur-
rently fit to further the welfare and best interests of the

child." *Bezio* v. *Patenaude*, 381 Mass. 563, 576 (1980). "The unfitness of parents . . . must be determined with respect both to their own character, temperament, capacity, and conduct, and to the welfare of the child in connection with its age, environment and affections." *Petition of the Dept. of Pub. Welfare to Dispense with Consent to Adoption*, 383 Mass. 573, 589 (1981), quoting from *Richards* v. *Forrest*, 278 Mass. 547, 533-554 (1932). See also *Custody of a Minor (No. 1)*, 377 Mass. 876, 883 (1979) (the critical inquiry is "current parental" unfitness). In a ruling, supplemented by additional findings made pursuant to the mandate of *Santosky* v. *Kramer*, 455 U.S. 745, 747-748, 769-770 (1982), the judge determined essentially on the "sole[ ] . . . basis of the length of time which has elapsed with no contact" between the putative father and the child that the father was "an unfit parent," and "to remove her at this time would cause mental upset, frustration and damage on the part of the child." We conclude that it was error to allow the Department's petition on the state of the record before the judge.[1]

The child was born on October 23, 1974. As in *Petition of the New Bedford Child & Family Serv. to Dispense with Consent to Adoption*, 385 Mass. 482, 483 (1982), there seems to be no dispute among the parties that the putative father is, in fact, the biological father of the minor child. Expressing concern for, but claiming inability to care for the child because "he was a bachelor, living alone," the father acquiesced to the Department's taking care and custody of the child on November 5, 1974. See G. L. c. 119, § 24. The child has a biological sister, and the father with his present wife (whom he married in June, 1975, after asserting paternity of the sister) adopted that sibling in 1977.

This action was commenced by the Department in September, 1977. The prospective adoptive parents are the fos-

---

[1] Our decision, of course, does not bear on present custody or what manner of visitation, if any, is appropriate.

ster parents who have cared for the minor child since she was two weeks old. The mother, the father, and the minor child are black, and the prospective adoptive parents are white. See Grossman, A Child of a Different Color: Race as a Factor in Adoption and Custody Proceedings, 17 Buffalo L. Rev. 303 (1968). See generally Bell, Race, Racism and American Law § 2.7 (2d ed. 1980). The judge found that the father has been prevented since November 5, 1974, from having any contact with the child by the Department and its predecessor agency. See note 3, *infra.*

We recognize that the lengthy separation of a biological parent and child and a corresponding growth in the ties between the child and foster parents may in some circumstances indicate that a change in the custodial status would be seriously detrimental to the child, with the result that the biological parent should be deemed not fit to care for the child. See *Petition of the Dept. of Pub. Welfare to Dispense with Consent to Adoption,* 383 Mass. at 590. But "[i]n resolving this issue we are guided by the underlying premise that natural parents have a fundamental right to the custody of their children." *Petition of the Dept. of Social Servs. to Dispense with Consent to Adoption,* 389 Mass. 793, 799 (1983). *Petition of the Dept. of Pub. Welfare to Dispense with Consent to Adoption,* 383 Mass. at 587. "[T]he natural bond between parents and children should be accorded great weight." *Bezio* v. *Patenaude,* 381 Mass. at 576. "Mere failure to exercise custodial rights in the past, particularly where a parent has voluntarily relinquished custody 'for appropriate reasons' [citation omitted], does not support a conclusion that such parent is unfit to further the welfare of the child." *Id.* at 577. These principles must be viewed in conjunction with the Supreme Judicial Court's oft-repeated statement that "[p]recipitate attempts to force adoption over parental objection simply because foster care has occurred are not consistent with the law and must be avoided." *Petition of the New Bedford Child & Family Serv. to Dispense with Consent to Adoption,* 385 Mass. at 490, quoting from *Petition of the New England Home for*

*Little Wanderers to Dispense with Consent to Adoption,* 367 Mass. 631, 646 (1975).

From the interplay of the primacy of parental rights and a child's need for stability and continuity has emerged the principle that the Commonwealth "may not attempt to force the breakup of a natural family without an affirmative showing of parental unfitness." *Custody of a Minor (No. 1),* 377 Mass. at 882. "The fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State." *Santosky* v. *Kramer,* 455 U.S. 745, 753 (1982). This is especially so when the State is seeking to sever completely and permanently the relationship. Unfitness of the parent, however, is a function of what is, at present, in the best interests of the child. The interests of the child and the fitness of the parents are to be considered together, as they merely "reflect different degrees of emphasis on the same factors." *Little Wanderers,* 367 Mass. at 641. Thus the "tests are not separate and distinct but cognate and connected." *Ibid. Custody of a Minor (No. 2),* 13 Mass. App. Ct. 290, 306 (1982), and cases cited.

The "best interests" standard set out in G. L. c. 210, § 3, is a flexible one, which requires the court "to focus on the various factors unique to the . . . [particular] individual for whom it must act." *Petition of the Dept. of Pub. Welfare to Dispense with Consent to Adoption,* 376 Mass. 252, 266 (1978), quoting from *Custody of a Minor,* 375 Mass. 733, 753 (1978). In considering the "best interests" of the child, the judge here should have considered, among other factors, the "fitness" of the father to assume parental responsibility, not just in the abstract, but in relation to this *particular* child. The judge should have considered the needs of the child, in light of her age, and what the positive and negative effects upon the child would be of allowing or denying the petition for adoption given the circumstances in this case. In general terms, the judge was well aware of the criteria

which were to guide him in his difficult task. We think, however, that particularly in the light of *Custody of a Minor*, 389 Mass. 755, 768-769 (1983), decided after he acted, there was insufficient exploration of whether, in these circumstances, it would be in the best interests of this child to have a total severance from the biological father and to have legally recognized adoptive parents.

We do not think the requisite showing of present unfitness has been made, largely because the findings presume an "either or" resolution of the case: custody with the father and total separation from the foster family or custody and adoption by the foster family with total separation from the father. The judge concluded that it would be a "traumatic experience for the child" to separate her from the foster parents. While this may well be so, we think that the judge should have explored to the same extent an equally important factor in the calculus, the question whether the process of becoming acquainted with the father at a present or future time would be beneficial or detrimental to the child's future welfare. While at the moment there appears to be no problem in the child's development and living environment, nowhere in the record does it appear that the judge considered the potential difficulties a black child may encounter as she grows older in a totally white environment and perhaps becomes anxious about her roots. Whether to cut off permanently the biological father in such circumstances is critical to any determination of the child's future welfare.[2] In the unusual circumstances present here, the interest of the child in establishing a relationship with a parent she does not know must be weighed against those interests of the child which would be protected by allowing the petition for adoption.

---

[2] The child may have an interest in knowing who her natural father is. However, it is also possible that it would be detrimental for the child at this age, and under present circumstances, to allow her biological father to visit, whereas at a later age the child may wish to establish a relationship with him.

The judge found, as earlier noted, that since November 5, 1974, the Department has not "permitted [the putative father] to see or to have any contact" with the child, and other than one brief encounter in January, 1981, there has been no other "direct contact" to the present.[3] To be sure, for several years the father appears not to have evinced any particular interest in the child. The judge found that the father began an intensive effort to seek out and obtain custody of the child in 1979 and, in his findings, the judge implied that the father had engaged in some activity, to that end, presumably less intensive, in 1977. This matter, however, has been pending in the courts since 1977. Cf. *Custody of A Minor*, 389 Mass. at 764 & n.2. It is unseemly for the Department to allow the process to drag on, prohibiting contact in the interim, and then argue in support of adoption that bonding has taken place. The Department should "take care to behave itself." Cf. *Commonwealth* v. *Tirrell*, 382 Mass. 502, 513 (1981) (Kaplan, J. dissenting). Heads I win, tails you lose is as offensive in this context as in any other area of governmental action.

It is well, before deciding, to put in sharp focus what this case is about. The question is not whether the child shall be ripped abruptly and untimely from her foster home, the only home she has ever known. What the case is about is whether she shall be adopted by the foster parents without her biological father's consent and whether the biological father and child are to be legally cut off from one another. On this record we conclude that the subsidiary findings do not warrant a determination of current unfitness sufficient to compel dispensing with the father's consent to adoption. Rather, upon further consideration by the probate judge, the facts may indicate the continuation of custody by the foster family with present or future visitation by the father.

---

[3] There is in the record testimony of a clinical psychologist which refers to a trip to New Hampshire by the father and the child's sister. That testimony indicated that the child interacted "nicely" with the sister, but does not speak to whether the father and the child saw one another.

The outcome of such visitations, if any, may serve as a guide whether in the future adoption without the father's consent is or is not indicated.

Deciding as we do, we have no occasion to comment on the extent, if any, to which the judge relied on the statutory presumption of G. L. c. 210, § 3(c). See in this regard, *Petition of the Dept. of Pub. Welfare to Dispense with Consent to Adoption,* 389 Mass. at 803, where the Supreme Judicial Court held that the statutory presumption was unconstitutional.

The decree is vacated, and the case is remanded to the Probate Court for further findings on the effects of physical custody remaining in the foster parents without a final decree of adoption, and whether present or future visitation by the father will contribute to the future welfare and best interests of the child. We do not, of course, foreclose the judge, on proper findings, from simply granting or denying the petition. The judge may take such additional evidence, including expert testimony, as he deems appropriate. If, however, a petition for guardianship or a complaint for visitation is filed within forty-five days of this rescript, such matters are to be consolidated with the instant case.

*So ordered.*