## Petitions of the Department of Social Services to Dispense with Consent to Adoption.

Suffolk. ·April 4, 1985. — August 30, 1985.

Present: Greaney, C.J., Rose, & Grant, JJ.

*Adoption,* Dispensing with parent's consent. *Parent and Child,* Custody, Dispensing with parent's consent to adoption.

Where it appeared that a judge, in granting petitions to dispense with parental consent to the adoption of four children, had placed great emphasis on the father's past pattern of behavior, although the father had withdrawn from the proceedings near the end of trial when he and the mother were divorced and there was no evidence that he would remain a presence in the mother's life, that the judge's conclusion with respect to the mother's unfitness was based largely on findings of her demonstrated past unfitness without sufficient attention to the mother's progress in stabilizing her life since she and her husband had separated, and that the judge had failed to consider the fitness of the mother to assume parental responsibility in relation to the needs of each particular child, the case was remanded for further proceedings. [695-699]

Petitions filed in the Suffolk Division of the Probate and Family Court Department on November 6 and December 4, 1979.

The cases were heard by *Robert L. Yasi,* J.

*Joan N. Feeney* for the mother.

*Madeline Mirabito Becker,* Assistant Attorney General, for Department of Social Services.

Rose, J. The mother of four daughters appeals from a Probate Court decision granting the petitions of the Department of Social Services (department) to dispense with her consent to adoption of each of the daughters. On September 26, 1978,

approximately four years before the trial commenced, the three older girls, along with their two brothers, were committed by order of the West Roxbury District Court to the permanent care and custody of the department pursuant to G. L. c. 119. The three girls then ranged in age from eleven months to three years and ten months. They were placed, apparently together, in one foster home, from which they were removed to a preadoptive home some ten months before trial. The boys, aged nearly nine and ten, were placed together, initially in a group care setting and subsequently in one foster home. The youngest daughter, born on April 9, 1979, was taken from her mother the following day and committed to the department's permanent care and custody in November, 1979, by the Boston Juvenile Court. She was placed in the home of a maternal aunt, where she has remained. In November and early December, 1979, the department filed petitions pursuant to G. L. c. 210, § 3, to dispense with the mother's and father's consent to adoption of all six children. Both parents opposed the petition, and separate counsel were appointed for each of them in November, 1981. By the time trial began in September, 1982, the parents had been separated for at least a year. The proceeding was conducted over several days in September, October and December, 1982, and in June, 1983. Near the end of the trial, a divorce judgment nisi having been granted, the father signed adoption surrenders for all six children and withdrew from the case. The mother signed surrenders for the two sons, who were then nearly fourteen and fifteen years old and who had expressed a desire to be adopted by their foster parents. The petitions as to the two boys were dismissed. By decrees dated September 15, 1983, the judge granted the petitions as to the four girls, who were at that time nearly nine, seven, nearly six and four years old, respectively.[1]  On appeal,

[1] The interval, then, between the filing of the petitions and the entry of judgment was almost four years. By that time the older daughters had been out of the home for over five years (most of their lives), and the youngest daughter virtually all of her life. It is apparent that the trial was suspended at least once, for a period of approximately six months, evidently in an attempt to reach some agreement by the separating parents and the foster parents regarding visitation. The department suggests that the additional

the mother's chief contentions are that her current parental unfitness was not established by clear and convincing evidence, and that the department failed to attempt to avoid breakup of the family as required by statutory policy and departmental regulations. We vacate the decrees, and remand the case for further proceedings.

We summarize the relevant facts. When a social worker of the Massachusetts Society for the Prevention of Cruelty to Children first visited their home in 1976, the parents had been married for nine years, their two sons and their two oldest daughters had been born, and all lived at home. The house was dirty. At that time the mother was withdrawn and appeared depressed. Over the course of approximately one and a half years of visits, during which time the parents' third daughter was born, the social worker observed that the children frequently fought with one another. The boys were not attending school regularly. The apartment continued to be dirty and inadequately equipped. The baby did not have a crib. The mother told the social worker that the father had hit one of the girls in the face; the same child also had a scar on her head resulting from a fall on a radiator. Throughout that period the social worker provided various services to the family, including money for a washing machine, summer camp and clothing for the boys, an attempt at homemaker service, an offer of an infant stimulation program, and an evaluation of the parents through a mental health center. A treatment plan resulting from

delay of over a year between the filing of a notice of appeal and the docketing of the appeal in this court appears to be due in part to the failure of counsel for the mother to submit transcripts to the Probate Court and to schedule a hearing on a motion for a stay pending appeal. At best, that would account only for the posttrial delay, and not for the long delay between filing the petitions and the trial, during most of which time, as will be seen, the mother was not permitted visitation with the daughters. Cf. *Petition of the Dept. of Social Servs. to Dispense with Consent to Adoption,* 16 Mass. App. Ct. 607, 612 (1983), *S.C.,* 391 Mass. 113, 118 n.7 (1984). The Supreme Judicial Court has recently had occasion to comment on the adverse consequences of "the inordinate length of time required for proceedings of this kind to move through the trial court." *Care & Protection of Three Minors,* 392 Mass. 704, 705 n.3 (1984). Cf. New Uniform Practices of Probate Courts of Massachusetts Xa (1982).

this evaluation included marital counseling for the parents and alcoholism therapy for the father. There was also evidence that the mother had an alcohol problem. In March, 1978, seeing numerous bruises on the two youngest girls, the social worker drove them to a hospital, where they remained for two weeks. These two children were then placed in foster care with the agreement of both parents. Continued observations of bruises on the mother and the older children, and the mother's report to the social worker that the father had attempted to strangle the oldest girl, led the social worker temporarily to remove the mother and the three oldest children to the home of the mother's aunt. Care and protection petitions were then filed for all five children which resulted in their commitment to the department's permanent care and custody in September, 1978. The youngest daughter was committed to the department's permanent care and custody approximately seven months after her birth in 1979. The petitions which are the subject of this appeal were filed a few weeks thereafter.

Some time after the children were removed from her home in 1978 and prior to her separation from her husband in 1980 or 1981 (the date of the separation not being made precisely clear), the mother's life began an upward turn which, from all that appears in the record, continued through the time of trial. She obtained a full-time assembly line job in a packing plant which she still held at the time of trial in 1982-1983. Her employer testified enthusiastically about the quality of her work. From late 1981 or early 1982 onward, the mother made her home with her aunt, arising early to go to work and retiring early in the evenings. She frequently babysat on weekends. She regularly visited her sons in accordance with the department's visitation plan and visited her three older daughters, at least for a brief period after the department was awarded custody in 1978. It does not appear that she was granted any visitation with her youngest daughter.[2]

[2] The parties do not dispute that visitation with the youngest daughter was prohibited by a 1979 order of the Boston Juvenile Court. The department contends, however, that some visitation with the three older daughters took place after these children were committed to the department's custody in

We approach this case, as we do any such proceeding, by first recognizing the fundamental right of natural parents to the custody of their children. *Petition of the Dept. of Pub. Welfare to Dispense with Consent to Adoption,* 383 Mass. 573, 587 (1981). *Petition of the New Bedford Child & Family Serv. to Dispense with Consent to Adoption,* 385 Mass. 482, 490 (1982). *Custody of a Minor,* 389 Mass. 755, 765 (1983). *Petitions of the Dept. of Social Servs. to Dispense with Consent to Adoption,* 389 Mass. 793, 799 (1983). Only for substantial reasons, to protect the basic rights of children, may the State intervene in the relationship between parent and child. See *Petition of the Dept. of Pub. Welfare to Dispense with Consent to Adoption,* 376 Mass. 252, 265 (1978), quoting from *Petition of the New England Home for Little Wanderers to Dispense with Consent to Adoption,* 367 Mass. 631, 645 (1975); *Petition of the New Bedford Child & Family Serv. to Dispense with Consent to Adoption,* 385 Mass. at 490. General Laws c. 210, § 3(*b*) and (*c*), provide express guidance to the judge in a proceeding where, as here, the State seeks irrevocably to cut off all legal rights of the parents. See *Petition of Catholic Charitable Bureau to Dispense with Consent to Adoption,* 392 Mass. 738, 740-741 & n.5 (1984); *Petition of the Dept. of Social Servs. to Dispense with Consent to Adoption,* 16 Mass. App. Ct. 607, 610 (1983), *S.C.,* 391 Mass. 113, 119 (1984). A decree dispensing with consent to adoption shall issue only if the best interests of the child will be served thereby, after the judge's consideration of "the ability, capacity, fitness and readiness of the child's parents . . . to assume parental responsibility, and . . . also . . . the plan proposed by the department." G. L. c. 210, § 3(*c*), as appearing in St. 1972, c. 800, § 2. Parental fitness and the child's best interests are to be considered and determined as "cognate and connected" rather than separate and distinct tests. See *Petition of the Dept. of Pub. Welfare to Dispense with Consent to Adoption,* 383 Mass.

---

1978. The mother counters that visitation with those daughters was unilaterally terminated by the department soon thereafter. On motion filed some four months before trial, the judge ordered that the mother was not to have visitation with any of the daughters

at 591, and cases cited. Neither concept is inflexible; both must be determined by the facts peculiar to an individual case. "Standards of mathematical precision are neither possible nor desirable in this field; much must be left to the trial judge's experience and judgment." *Adoption of a Minor,* 378 Mass. 793 (1979), quoting from *Petition of the New England Home for Little Wanderers to Dispense with Consent to Adoption,* 367 Mass. at 646. "It is conceivable that certain parents might be fit to bring up one child and unfit to bring up another . . . . The unfitness of parents . . . must be determined with respect both to their own character, temperament, capacity, and conduct, and to the welfare of the child in connection with its age, environment and affections." *Petition of the Dept. of Pub. Welfare to Dispense with Consent to Adoption,* 383 Mass. at 589, quoting from *Richards* v. *Forrest,* 278 Mass. 547, 553-554 (1932). See *Petitions of the Dept. of Social Servs. to Dispense with Consent to Adoption,* 389 Mass. at 799-800; *Petitions of the Dept. of Social Servs. to Dispense with Consent to Adoption,* 18 Mass. App. Ct. 120, 125 (1984); *Petition of Boston Children's Serv. Assn. to Dispense with Consent to Adoption, ante* 566, 567. While "[t]he potential effect of the judge's decision on the child is not irrelevant, . . . any adverse impact on a child from being returned to his or her parent cannot alone support a decision to dispense with consent to adoption." *Petition of the Dept. of Social Servs. to Dispense with Consent to Adoption,* 392 Mass. 696, 700 (1984). The "extreme step" of terminating parental rights, which inevitably results from the allowance of such a petition, must be justified by "clear and convincing evidence that the parent's unfitness to assume parental responsibility is such that it would be in the best interests of the child for all legal relations to be ended." *Petition of the Dept. of Social Servs. to Dispense with Consent to Adoption,* 391 Mass. 113, 119 (1984).

It has also long been the rule that, for the purposes of G. L. c. 210, § 3, parental fitness must be currently assessed. See *Petition of the Dept. of Pub. Welfare to Dispense with Consent to Adoption,* 383 Mass. at 589; cf. *Bezio* v. *Patenaude,* 381 Mass. 563, 570 n.6, 576 (1980). In appropriate cases, an on-

going or past pattern of behavior or a persistent parental charac-
teristic may furnish a prognosis of how a child might fare if
physical custody in the parent were to be continued or resumed.
See *Petitions of the Dept. of Social Servs. to Dispense with
Consent to Adoption,* 389 Mass. at 801; *Petition of Catholic
Charitable Bureau to Dispense with Consent to Adoption,* 395
Mass. 180, 185 (1985); *Petition of Catholic Charitable Bureau
to Dispense with Consent to Adoption,* 13 Mass. App. Ct. 936,
938 (1982). We think that the judge in this case improperly
emphasized the father's past pattern of behavior within the
family and the mother's reaction to that past pattern. We rec-
ognize that the father was a party to this action, that he was
represented by separate counsel throughout the proceedings,
and that he withdrew from the case only upon the entry of a
judgment nisi near the very end of the trial. Understandably,
a great deal of evidence concerning his previous treatment of
the children and of his wife was received by the judge. After
the father withdrew his opposition to the petitions, however,
and in the absence of any evidence that he would remain a
presence in the life of the mother,[3] references in the findings
to his past behavior within the family, which exceeded refer-
ences to the mother's current situation, could no longer have
any prognostic value in determining her parental fitness or the
children's best interests. Contrast *Petition of Catholic Charit-
able Bureau to Dispense with Consent to Adoption,* 395 Mass.
at 186. Compare *Custody of a Minor (No. 2),* 392 Mass. 719,
723-724 (1984). On the question of the mother's fitness alone,
the judge made the following findings: she had a good ability
to perform repetitious tasks, and was an excellent and steady
worker at her assembly line job, a job which required no
abstract thinking or problem solving and was good for her
self-esteem; she had abstained from alcohol since acquiring the

---

[3] The evidence shows that the mother and father had lived apart for at
least one year before the trial and had had little or no contact, aside from
visitation with their two sons, since the time of their separation. There was
no evidence of contact between the father and any of the daughters after
their placement outside the home beyond a few visits with the girls sub-
sequent to the award of their custody to the department.

696                                   20 Mass. App. Ct. 689

Petitions of the Department of Social Services to Dispense with Consent to Adoption.

job; and she was able to babysit properly for a friend so long as the necessities for that task were provided. Countering these essentially positive findings, cf. *Adoption of a Minor,* 17 Mass. App. Ct. 993, 995 (1984), were findings that the mother's "natural impediments" included intelligence within the mentally retarded range[4] "with an anxiety behavior characterized by low self-esteem"; that her long-term memory had been impaired, perhaps by alcohol abuse; that her ability to cope diminished as stress increased; that "[f]or many years [she] . . . was further hindered by an abusive, alcoholic husband"; and that "for a long period of time [she] could not and did not cooperate [with plans attempted by the department]. She always 'went along' with [the father] . . . . She was aware that [he] was beating the children." The judge concluded that she "would not be able to stand the stress of the return of these children and the loss of her job (which [the judge found] she plans to leave if the children are returned)."[5] We agree with the mother that this conclusion, drawn largely from findings of her demonstrated past unfitness with respect to raising her children, is not based on clear and convincing evidence of current unfitness.[6] See *Petitions of the Dept. of Social Servs. to Dispense*

---

[4] The judge expressly and properly ruled that evidence of mental retardation is not in itself a ground for terminating parental rights.

[5] The mother rightly complains that the judge's finding that the aunt with whom she made her home could not "permit her to bring children there to live" was clearly erroneous. In fact, the aunt testified that her dining room could be converted to accommodate the three older daughters and that the youngest child could sleep in the mother's room. There was also evidence, however, that the mother intended to quit her job and attempt to secure public housing should the children be returned to her. As the decrees are to be reversed, the question of the mother's housing plans will be an appropriate one for consideration in any further proceeding.

[6] In this case, evidence of the mother's past pattern of neglect or misconduct was rebutted, at least to some extent, by more recent proof of parental capacity. Cf. *Custody of a Minor (No. 1),* 377 Mass. 876, 883 (1979). We do not intimate that testimony of a psychiatrist and a psychologist who administered intelligence and personality tests to the mother just prior to trial, and on which the judge relied heavily, had no bearing on the question of the mother's current fitness. Cf. *Petition of the Dept. of Pub. Welfare to Dispense with Consent to Adoption,* 383 Mass. at 593.

*with Consent to Adoption,* 18 Mass. App. Ct. at 126. See also *Petition of the Worcester Children's Friend Soc. to Dispense with Consent to Adoption,* 9 Mass. App. Ct. 594, 599-600 (1980).

Reversal is also required by the judge's conclusion that the best interests of each of the children would be served by dispensing with the mother's consent to the department's plan for their adoption. The judge failed to consider "among other factors, the 'fitness' of the [mother] to assume parental responsibility, not just in the abstract, but in relation to [each] *particular* child. The judge should have considered the needs of [each] child, in light of her [respective] age, and what the positive and negative effects upon [her] would be of allowing or denying the petition . . . given the circumstances in this case." *Petition of the Dept. of Social Servs. to Dispense with Consent to Adoption,* 16 Mass. App. Ct. at 610. See *Petition of the Dept. of Pub. Welfare to Dispense with Consent to Adoption,* 376 Mass. at 266; *Petitions of the Dept. of Social Servs. to Dispense with Consent to Adoption,* 389 Mass. at 799-800. Such a determination includes consideration of the placement of the siblings, together or separately, as evidenced by the department's plan under c. 210, § 3, cf. *Care & Protection of Three Minors,* 392 Mass. at 715, as well as consideration of any special needs of any of the children in relationship to the mother's capacity and ability to deal with those needs. See *Petitions of the Dept. of Social Servs. to Dispense with Consent to Adoption,* 18 Mass. App. Ct. at 125, and cases cited; *Petition of Boston Children's Serv. Assn. to Dispense with Consent to Adoption, ante* at 573. In the case before us, the judge found from the testimony of a psychiatric social worker that the oldest daughter was in long-term therapy for a psychiatric disorder resulting from early childhood traumas. He found from the testimony of a child psychologist that the youngest daughter had a speech handicap.[7] Notwithstanding the judge's general

---

[7] The speech handicap was termed by the psychologist "a very marked delay in expressive language," which may have been genetic and which would require "substantial intervention in terms of an early childhood education program . . . because [the expert] didn't feel the [foster mother] had the time to be able to do that herself."

finding (intermixed, as were other findings of fact, with his rulings of law) that "[t]he children subject of these petitions have been shown to have special needs, which [the mother] does not seem to comprehend," he made no specific finding of special needs with respect to the two middle daughters. Compare 18 Mass. App. Ct. at 123, 125-126. Nor did he make any other specific findings respecting the children except that the three older daughters had formed an emotional bond with their foster family. Despite his ruling that parental fitness must be viewed in the light of the special needs of the particular children, and the ability of the parent to address those needs, it is clear from his ultimate conclusion that the judge erred in considering the children's best interests collectively only rather than also individually, and in determining the mother's unfitness by contemplating the return to her custody of all as opposed to any one or more of the four daughters: "The Court finds that [the mother] cannot be expected, with even abnormal help, to reintegrate these children, some of whom are still recovering, into a new family unit with mother . . . . The Court finds that the children cannot reasonably be expected to survive emotionally another traumatic assault upon their basic emotional and mental health by removal from their present bonded situations." Contrast *Petition of the Dept. of Pub. Welfare to Dispense with Consent to Adoption,* 376 Mass. at 260-262. See *Petition of Catholic Charitable Bureau to Dispense with Consent to Adoption,* 18 Mass. App. Ct. 656, 661 (1984), *S.C.* 395 Mass. 180, 185 n.6 (1985).

There was evidence that during their long separation from their natural mother, the children had formed emotional ties to their respective foster parents. Although the judge correctly ruled that "[a]djustment of a child to new foster parents does not alone warrant termination of parental rights," see *Petition of the Dept. of Pub. Welfare to Dispense with Consent to Adoption,* 383 Mass. at 591 n.16, his findings concerning the children suggest that he gave undue weight to these factors on the facts of this case.[8] See and compare *Petitions of the Dept. of*

----

[8] The following excerpts are illustrative: "The [youngest] child would not know either of [the natural parents] . . . . [the three older daughters] have

*Social Servs. to Dispense with Consent to Adoption,* 18 Mass. App. Ct. at 125-127, wherein the "long separation of [the children] from the parents, considered in light of the evidence of current parental unfitness . . . militate[d] against an attempt at reunification . . . [and] the judge . . . rested his ultimate conclusion upon the parents' continuing problems, the fragile nature of their home, and the severe emotional needs of [the children] which called for an immediate and permanent solution." *Id.* at 127.

Since the decrees must be vacated in this case, we need not reach the mother's other arguments or belabor the issue of the department's responsibility, enunciated in G. L. c. 119, § 1, to attempt to strengthen the family unit "before it may proceed with plans to sever family ties permanently." *Petition of the Dept. of Pub. Welfare to Dispense with Consent to Adoption,* 376 Mass. at 266; cf. *Petition of Catholic Charitable Bureau to Dispense with Consent to Adoption,* 392 Mass. at 743. Here, the evidence was very strong that the children's safety in 1978 required their placement out of the parents' home, and the placement of the last baby born to the marriage in early 1979 was presumably warranted for the same reason. We share the mother's concern, however, that the department, at the very least, failed to work toward her visitation with the daughters, apparently from a time shortly after it was awarded custody of the three older daughters in 1978, and in the face of the mother's continuous progress in stabilizing her life and diminishing or eliminating factors which had contributed to her

---

formed an emotional bond with their foster parents . . . . The children have been living apart from their parents for over four years . . . . There would be substantial harm to the children by returning them to their mother's care." With respect to this last excerpt, we note that the instant trial was concluded before the court had the benefit of the decisions in *Petition of the Dept. of Social Servs. to Dispense with Consent to Adoption,* 391 Mass. at 119, and *Petition of the Dept. of Social Servs. to Dispense with Consent to Adoption,* 392 Mass. at 700, on the consideration, in G. L. c. 210, § 3, cases, of potential adverse impact on the child returning to the natural parent. See also *Care & Protection of Three Minors,* 392 Mass. at 716 & n.18. In any event, our reversal need not depend upon that aspect of the judge's findings.

earlier parental unfitness.[9] Cf. *Petitions of the Dept. of Social Servs. to Dispense with Consent to Adoption,* 18 Mass. App. Ct. at 126 n.12.

The decrees are vacated, and the case is remanded to the Probate Court for further proceedings. The department is to retain permanent care and custody of all four daughters. A service plan is to be instituted without delay pursuant to current departmental rules, regulations and policies. The possibility of the mother's regaining custody of the daughters, individually and collectively, is to be considered before proceeding with the petitions to dispense with her consent to the adoption of any of the daughters. Cf. *Petition of the New Bedford Child & Family Serv. to Dispense with Consent to Adoption,* 385 Mass. at 490. Under the service plan the department is to explore fully and to encourage, if appropriate, the prospect of visitation rights. See *Custody of a Minor (No. 2),* 392 Mass. at 725-726. On proper petition by the mother, such visitation orders as may be appropriate may be entered.

*So ordered.*

---

[9] A department social worker who had been assigned to work with the parents and with the youngest child in September, 1981, testified that she had offered alcoholism treatment programs to both parents and had told the mother that her cooperation in accepting treatment would assist the mother's case when the petitions were heard. The mother denied having an alcohol problem but usually kept appointments with and scheduled by this social worker. There was no evidence that any services except alcoholism counseling were offered to the mother between 1981 and the time of trial, and no evidence of the nature of the department's service provided between 1978 and 1981. The social worker testified that the department's plan when she was assigned to the case was "to go for adoption release" and that department adoption workers were then involved as well. She neither arranged nor encouraged visitation, nor was she aware of any attempts to arrange visitation by her predecessor in the case. The record shows that the foster parents of the three older girls were opposed to visitation and that the department acquiesced in this opposition. As has been noted, a 1979 court order prohibited visitation with the youngest daughter. We assume the department's plan for adoption did not provide for visitation rights in the mother. The record provides little guidance in this area. See and contrast *Petition of the Dept. of Pub. Welfare to Dispense with Consent to Adoption,* 383 Mass. 376, 379-380 & n.4 (1981).