## ADOPTION OF ILONA.[1]

No. 09-P-667.

Suffolk. September 16, 2009. - March 19, 2010.

Present: CYPHER, GRAHAM, & FECTEAU, JJ.

Further appellate review granted, 457 Mass. 1101 (2010).

*Adoption,* Care and protection, Dispensing with parent's consent, Visitation rights. *Parent and Child,* Dispensing with parent's consent to adoption. *Evidence,* Child custody proceeding. *Americans with Disabilities Act.*

A Juvenile Court judge hearing a petition for care and protection did not err in terminating the mother's parental rights, where, although the Department of Children and Families failed to provide services to improve the mother's parenting skills that were more closely geared to her special needs, the mother's cognitive impairments were significant and directly affected her ability to be or to become a fit parent [485-488]; however, the lack of court-ordered posttermination or postadoption visitation, despite the judge's findings that a significant attachment existed between the mother and child and that continued contact between them was in the child's best interest, warranted a remand to the Juvenile Court for further consideration of and orders on those issues [488].

PETITION filed in the Suffolk County Division of the Juvenile Court Department on December 28, 2006.

The case was heard by *Joseph F. Johnston,* J.

*William T. Cuttle* for the mother.

*Joyce Koo Dalrymple,* Assistant Attorney General, for Department of Children and Families.

*Diana Cowhey* for the child.

GRAHAM, J. A judge of the Juvenile Court determined that the mother's only child, Ilona, was in need of care and protection, committed Ilona to the permanent custody of the Department of Children and Families (department), and terminated her parental rights pursuant to G. L. c. 119, § 26, and G. L. c. 210, § 3. The mother does not contest the finding of her unfitness at the

[1] A pseudonym.

time of trial, but argues that the department failed reasonably to accommodate her cognitive impairments by providing services specifically tailored to meet her special needs and designed to improve her parenting skills. If appropriate services had been provided, she continues, her unfitness "may have been temporary." The mother also contends that the judge erred in granting the adoptive parents discretion regarding postadoption visitation.

1. *Background.*[2] The mother was born in Puerto Rico in 1972 and raised in a family consisting of her parents, two brothers, and a sister. She attended school in Puerto Rico, completing the eleventh grade.[3] In 1991, her mother, with whom she had a warm and loving relationship, passed away, from complications related to diabetes and a heart condition. The mother was later diagnosed as suffering from clinical depression and was prescribed Prozac to treat her depression.[4]

Following her mother's death, the mother moved to Florida to live with a brother, and then moved to Boston to live with her aunt. In Boston, she met Ilona's father and became pregnant with Ilona. The mother gave birth to Ilona on April 23, 1997.[5]

The mother has certain cognitive impairments. Cognitive testing by Anthony Castro, Psy.D., Ph.D., a court-appointed expert, placed her within the range of "Borderline Intellectual Functioning." She does not have contact with her family, and although she lives in an apartment in the greater Boston area, she seldom interacts socially with her neighbors. Despite those impairments, the mother has demonstrated her ability to live independently,

[2]We derive the facts from the judge's findings and from other uncontroverted evidence in the record before us.

[3]The mother continued her education in a vocational program at Madison Park High School in Boston, specializing in dental hygiene. She did not continue in that field after high school, reportedly due to reactions to certain chemicals she would have had contact with as a hygienist. The mother has never worked and receives Social Security disability benefits.

[4]The mother's relationship with family members other than her mother was not close or supportive. She was occasionally physically abused by her father and was emotionally abused by her brothers. For a period after her mother's death, the mother experienced auditory hallucinations and contemplated suicide.

[5]After the mother became pregnant, the father left her and abandoned Ilona. The father is not involved in Ilona's life, nor does he provide any support. He never appeared in court to oppose the petition after notice was made by publication. The department has had no contact with the father throughout the pendency of this matter.

maintain a neat and clean home, utilize community resources, and attend church on a regular basis. She has adequately attended to Ilona's personal needs and kept Ilona up to date with her medical appointments. Consequently, Ilona is a healthy child and does not have any medical conditions or take any medications.

The department first became involved with the family in 2001, when it received two reports of physical abuse pursuant to G. L. c. 119, § 51A (§ 51A report). After investigation pursuant to G. L. c. 119, § 51B, the department supported both reports. The mother participated in parenting classes in 2000 and 2001.[6] There was no further involvement between the department and the family until October, 2006, when the department investigated and supported a 51A report stating that the mother had hit Ilona and pulled her hair. Then, on December 27, 2006, police responded to a 911 call and observed Ilona with bruising on her face, hips, and arms. Ilona was transported to Whittier Hospital in Revere for evaluation and later released to the custody of her godmother.[7]

The following day, the department filed an emergency petition for care and protection in the Suffolk County Division of the Juvenile Court Department. The judge granted the department temporary custody of Ilona. Later, the mother waived her right to a temporary custody hearing, and custody remained with the department. On December 28, 2006, Ilona was placed in a foster home and has been there since that time. When Ilona first arrived at the foster home, she displayed numerous behavioral problems. The department provided the foster parents with family therapy, including individual therapy sessions, and Ilona's behavioral problems soon ended.

The foster parents also enrolled Ilona in reading classes on Saturdays and after-school classes and advocated for an individualized education plan (IEP) to help Ilona improve her academic

---

[6]The record is not clear as to exactly when the § 51A reports were filed, when those reports were supported, and when services were provided. The discrepancies are of no import.

[7]Ilona informed investigators that the mother had hit her with a belt because she did not want to eat the meal the mother had served for dinner. She further stated that the mother hit her with her hand or a belt when she refused to perform chores. This happened, she said, at least three or four times a week. The mother pleaded guilty to charges of assault and battery by means of a dangerous weapon and assault and battery on a child causing bodily injury, and was placed on probation for eighteen months.

skills.[8] After one year, Ilona's grades improved and she no longer required an IEP.

2. *The service plan.* On January 9, 2007, a department social worker conducted a home visit with the mother. After some initial delays, the mother was provided with a service plan intended to improve the mother's parenting skills that included a nurturing class, which Ilona also attended, and a program to teach the mother alternative forms of discipline and anger management.[9] The mother completed both programs, which were conducted in Spanish, and reported that she enjoyed and learned a great deal from them. However, after the classes respectively ended in May and July of 2007, the department refused to offer her more classes because the mother had difficulty understanding the concepts taught and failed, during supervised visits with Ilona, to demonstrate that she had learned those concepts.

On July 18, 2007, the mother, through her attorney, requested that she be provided family counseling with Ilona. Apparently, no action was taken on that request. The following month the department held a permanency planning conference during which the goal was changed from reunification to adoption. In September the mother was informed of the change, and on October 16, the department filed its permanency plan with the revised goal. The mother requested additional services in July and September.

On May 14, 2008, the mother filed a motion to compel the department to follow department regulations. In that motion, she argued that the department had relied improperly on a July 18, 2007, parenting evaluation in formulating its permanency plan.[10] The motion was denied on June 27, 2008, and hearings on the merits of the petition were held on July 21, 22, and 28,

---

[8]When Ilona was placed in foster care she was not reading or writing and was failing most of her classes.

[9]The department also recommended that the mother participate in a day program that would assist her in job training and job placement, but she declined to participate in the program out of concern that she might lose her Social Security disability benefits.

[10]Nita Guzman, the initial expert hired by the department to perform a parenting evaluation of the mother, completed her evaluation on July 3, 2007. Guzman was skeptical of the mother's ability to change her behavior in regard to Ilona and noted that, even if the mother used effective parenting strategies, that use would only be temporary. Guzman concluded, in essence, that the goal for the mother and Ilona should not be reunification. On August 14, 2007, the department conducted a permanency planning conference and changed

August 1, and September 3, 2008. On September 10, the judge issued a decree concluding that the mother was unfit and that termination of her parental rights was in Ilona's best interests.

3. *Discussion.* For a judge to take the "extreme step" of irrevocably terminating the legal relationship between a parent and child, he must determine by "clear and convincing evidence that the parent is currently unfit to further the child's best interest." *Adoption of Carlos*, 413 Mass. 339, 348 (1992). See *Care & Protection of Martha*, 407 Mass. 319, 327 (1990). "[C]areful factual inspection and specific and detailed findings," *Adoption of Harriet*, 29 Mass. App. Ct. 111, 112 (1990), by the trial judge are required to "demonstrate that close attention has been given the evidence." *Custody of Eleanor*, 414 Mass. 795, 799 (1993). A reviewing court will not disturb a trial judge's subsidiary findings unless they are clearly erroneous. *Adoption of Helen*, 429 Mass. 856, 859 (1999).

In termination proceedings, "the parents' rights are secondary to the child's best interests and thus, the proper focus of termination proceedings is the welfare of the child. . . . '[T]he central judgment' concerns whether [the] parent 'has the capacity to act as a fit parent'. . . . [The] judge's task is to determine (1) whether parents can assume parental responsibility for [the] child; and (2) whether dispensing with parental consent to adoption serves [the] best interests of [the] child." *Adoption of Gregory*, 434 Mass. 117, 121-122 (2001), quoting from *Adoption of Nicole*, 40 Mass. App. Ct. 259, 262 (1996). Cognitive impairment of a parent is not itself a ground for terminating parental rights. See *Adoption of Abigail*, 23 Mass. App. Ct. 191, 195 (1986). See also *Petitions of the Dept. of Social Servs. to Dispense with Consent to Adoption*, 20 Mass. App. Ct. 689, 696 & n.4 (1985).

It is clear that the department is required to make reasonable efforts to strengthen and encourage the integrity of the family before proceeding with an action designed to sever family ties.

the goal to adoption. After Guzman's evaluation, the mother hired an expert who discovered that Guzman was not a licensed clinician. The judge decided not to use the Guzman evaluation at trial and appointed Tasha Baizerman, a licensed clinical social worker, to perform a parenting evaluation of the mother. Baizerman first met the mother on March 6, 2008, and issued her report on April 30. The trial judge, in his findings, stated that he did not give any weight to the Guzman report or consider Guzman's recommendation or evaluation of the mother.

*Adoption of Lenore*, 55 Mass. App. Ct. 275, 278 (2002). See *Petition of the Dept. of Pub. Welfare to Dispense with Consent to Adoption*, 376 Mass. 252, 267-269 (1978); G. L. c. 119, §§ 1, 29C; G. L. c. 210, § 3(*c*)(iv); 110 Code Mass. Regs. § 1.01 (2008).[11] The requirement includes accommodating the special needs of biological parents who are handicapped or disabled. See *Adoption of Gregory*, 434 Mass. at 122; *Care & Protection of Elaine*, 54 Mass. App. Ct. 266, 274 (2002); *Adoption of Lenore*, *supra*; 110 Code Mass. Regs. §§ 1.08, 1.09 (2008). It is incumbent on the biological parent, however, to raise the issue of "inadequate services in a timely manner so that reasonable accommodations may be made." *Adoption of Gregory*, *supra* at 124.

According to *Adoption of Gregory*, the proper avenue for review of a claim that reasonable services have not been made is at the time the plan is adopted or reasonably thereafter (1) by pursuing an administrative hearing pursuant to 110 Code Mass. Regs. §§ 6.07 and 10.05 (2008) or (2) by filing a suit against the department under the Americans with Disabilities Act. 434 Mass. at 124. Parents may also seek administrative relief when there is a goal change and when services are terminated pursuant to 110 Code Mass. Regs. § 10.06 (2008).

Here, the department terminated services and changed its goal based on a parenting evaluation that was discredited. See note 10, *supra*. A subsequent parenting evaluation, undertaken by Tasha Baizerman, a licensed clinical social worker who was appointed by the trial judge, was not available until April 30, 2008. That evaluation, while highly critical of the mother's ability to parent, did suggest alternative services that might meet the mother's special needs. As trial was approaching, the mother, as noted above, filed a motion on May 14 alleging that the department abused its discretion by not complying with department regulations. The judge endorsed the motion as follows: "After hearing, within motion is denied. Issues raised may be presented at the hearing of the merits of the petition as to whether the

[11]The 2008 version of the regulations at issue in this case is substantively the same as those in effect since the commencement of this case and only reflect the change in name from the Department of Social Services to the Department of Children and Families. See G. L. c. 6, § 172B, as amended by St. 2008, c. 176, § 8.

department has met its obligation to make reasonable efforts for reunification."

Though the mother had stopped receiving services after the change in goal, prior to that she had received services, including two courses in Spanish. Notwithstanding those services, and her weekly individual therapy, which she started in November of 2005, she was unable to understand the skills and concepts taught in the nurturing and anger management classes. She also had been offered a job training program to help abate her social isolation and gain independence. She refused to take part in that program even after being informed that she could work up to twenty-five hours per week without losing her Social Security disability benefits. It should also be noted that after the goal change, visits with Ilona and the social worker continued, as did her weekly individual therapy.

Further, though both Castro and Baizerman noted that the department could have done more in regard to providing services that were more closely tailored to the mother's level of functioning,[12] they concluded that it was not likely that those services would have been sufficient. Castro concluded that the mother's cognitive impairments were significant and would directly affect

---

[12]Castro made three specific recommendations: (1) that information and directions should be simplified to approximately a second grade level when presented to the mother; (2) that rehearsal of behavioral techniques newly taught to the mother was essential; and (3) that focus should be placed on assisting the mother to develop "a social network of trusting individuals from whom she could seek guidance and comfort on a regular basis." Castro noted that "connecting [the mother] with local community service agencies would also satisfy this need."

Baizerman noted that the department had placed the mother "in standard parenting [classes] without evaluating her or assessing her individual treatment needs [and that] [g]iven the mother's cognitive limitations, her placement in instructional groups with higher functioning people did not address her specific parenting issues and personal problems." Baizerman also noted that the quality and depth of communications between the mother and the department had been negatively affected by the inconsistent use of interpreters or Spanish-speaking case workers.

Baizerman suggested that the mother might be "a good candidate for behavioral therapy (CBT), a model of therapy which focuses on modifying negative beliefs and behaviors." Finally she recommended that "[i]f [the department was] to continue to work with [the mother] they should obtain consultive services with the Department of [Developmental Services] . . . so that the service plan and any planned program interventions are targeted to [the mother's] identified problems."

the mother's ability to parent Ilona. Baizerman, who observed two visits between the mother and Ilona, was highly critical of the mother's parental fitness, finding, among other things, that the mother had significant cognitive impairments, had limited insight to her parenting problems, and suffers from social isolation. Of crucial importance, Castro and Baizerman focused on the problems the mother would have parenting Ilona as Ilona got older and her needs became more complex. Though we do not excuse the department for its failing to provide services more closely geared to the mother's special needs, we conclude that in the circumstances here where there was little hope that the mother would become a fit parent, there was no error in the judge's decision to terminate the mother's parental rights.

4. *Visitation.* The lack of court ordered posttermination and postadoption visitation is troubling, and remand is required to address that issue. The trial judge found that "[t]here exists a significant attachment between [Ilona] and Mother [and that] [c]ontinued contact between [Ilona] and Mother is in [Ilona's] best interest." During the two visits that Baizerman observed, she noted that Ilona was happy and excited to see the mother and that, notwithstanding a "lack of spontaneous conversation," the two "seemed to enjoy themselves and laughed." Baizerman also noted that Ilona's social worker reported that Ilona, while acknowledging the physical abuse, wanted to have continued contact with the mother. In her reports, the social worker also acknowledged that visits went well. Baizerman concluded that the "relationship" between Ilona and the mother warranted their having continued contact with each other. In these circumstances, the judge abused his discretion in not ordering specified visitation. See *Adoption of Vito*, 431 Mass. 550, 563 (2000) (mandated postadoption visitation would in most instances not be warranted where the child has formed significant bonds with a preadoptive family and where there is no such bond with the biological parent); *Adoption of Rico*, 453 Mass. 749, 754 (2009) ("[t]he best interests of the child are the overarching and governing concern").

Thus, the case is remanded for further consideration and orders on the issue of posttermination and postadoption visitation. The judge in his discretion may decide whether an evidentiary hearing is necessary. In all other respects, the decree is affirmed.

*So ordered.*